## DUFFIE *v.* CLARK.

1. BILL OF SALE—CONSTRUCTION—SECURITY FOR ADVANCEMENTS.

A debtor executed a bill of sale of his stock of goods under an agreement providing that the vendee should furnish not to exceed $1,200 for the purpose of discharging the indebtedness of the vendor, and that the bill of sale should be security for the moneys so to be advanced; that the vendee should resell the stock upon payment by the vendor of $1,600, in monthly installments; that in the meantime the stock and all additions thereto should remain the property of the vendee; that no in-

debtedness should be incurred without his knowledge; that the goods should be insured in his favor; and that, in case of his death before the entire $1,600 should have been paid, his representatives should execute a bill of sale to the vendor upon repayment of the amount advanced, with interest. The vendor continued the business for several months, when the vendee took possession. *Held,* that the absolute title did not pass to the vendee.

2. TRUST TO PAY DEBTS—GOOD FAITH—BURDEN OF PROOF—EVIDENCE.

One who sells to his brother, at private sale, goods of which he has taken possession under an agreement to account to the owner for the proceeds after satisfying certain indebtedness, has the burden of showing that he acted in entire good faith, when sued for the value of the goods; and, as bearing upon that question, all of the circumstances attending the prior transactions between himself and the owner relating to the property are material.

3. SAME—ACCOUNTING.

Where property has been turned over to a person upon h s undertaking to pay a claim against the owner and account for the balance of the proceeds, and at the former's suggestion the claim is put in judgment, he cannot charge the own r with the costs thus incurred, or with interest accruing upon the claim after the disposition of the goods.

Error to Wayne; Donovan, J. Submitted May 2, 1895. Decided July 13, 1895.

*Assumpsit* by John H. Duffie, trustee, against John E. Clark, to recover the value of a stock of goods. From a judgment for defendant, plaintiff brings error. Reversed.

*Sloman, Groesbeck & Robinson,* for appellant.

*Jayne & Lynch,* for appellee.

McGRATH, C. J. Plaintiff's assignor, one Hoeger, was, on November 25, 1891, engaged in the drug business. His stock and fixtures are alleged to have been worth at that time about $2,000. He was indebted to various parties, and, in order to obtain money with which to pay his indebtedness and enable him to carry on the business,

he executed a formal bill of sale to defendant of all his stock and fixtures. The bill of sale contained the following provision:

"And said first party expressly agrees to keep said goods and chattels insured in the sum of $1,000 or more, in favor of said second party, but at said first party's own expense; and, while said first party shall have charge of said store and stock of goods, he expressly agrees to incur no indebtedness therefor, except with the full knowledge and assent of the second party hereto."

At the same time an agreement was entered into, the material portions of which are as follows:

"*Whereas*, said bill of sale is given as security for certain money furnished and to be furnished by said Clark to pay for and in behalf of said Hoeger certain debts now owing by said Hoeger:

"It is hereby expressly agreed that said Clark shall sell to said Hoeger said goods and chattels included in said bill of sale upon payment to said Clark by said Hoeger of the sum of $1,600, as follows: $50 monthly for 32 consecutive months, according to a series of promissory notes this day given by said Hoeger; the first payment falling due one month from to-day.

"It is further expressly agreed that said goods and chattels shall remain entirely the property of said Clark until the sum of $1,600 shall be paid in full, as above provided.

"It is further expressly agreed that all goods purchased by said Hoeger, to be added to said stock for sale, shall become the property of said Clark from the moment of the purchase by said Hoeger.

"It is further agreed that said Clark shall not be bound to furnish to and for said Hoeger more than the sum of $1,200 in all in consideration for said bill of sale.

"It is further agreed that said Clark shall not be bound to furnish the said Hoeger at any one time more than the sum of $50.

"It is further agreed that said Hoeger shall incur no debts regarding said goods and chattels, except with the knowledge and consent of said Clark.

"It is further agreed that said Hoeger, in case of death of said Clark before the entire $1,600 shall be paid as above provided, shall be entitled to receive from the rep-

resentatives of said Clark a bill of sale of said goods and chattels upon the payment by said Hoeger of all moneys that have been actually advanced by said Clark, with 8 per cent. interest thereupon.

"Said Hoeger agrees to keep said goods and chattels at all times insured in favor of said Clark for the sum of not less than $1,000."

Hoeger continued to conduct the business until some time in May, 1892, at which time Clark took possession of the store. Defendant had up to that time advanced to Hoeger $150, and Hoeger had paid one of the notes mentioned in the agreement. Hoeger claims that on several occasions he applied to defendant for further advances under the agreement, but defendant finally refused to make any further advances; that, in consequence of defendant's failure to make the advances, it was impossible for him to continue the business; that in May, 1892, he went to defendant.

"The circumstances under which I turned the same over to Dr. Clark were as follows: There was about $1,100 due me under that agreement at that time. A short time before that I went to see Dr. Clark at his office on John R. street, and told him I had to have more money, and he told me that he could not give me any at that time. He told me that he did not have any. He explained that he had a number of investments made just at that time, and all his money was taken up, and he could not give me any money. I told him I would like to make an arrangement with him in that case to turn the store over to him, and let him try to sell it, and we agreed he would do so, and, in case he should sell it, he would try to sell it for $1,800. That was supposed to be the value of it. And if he could sell it for $1,800 he was to give me $300 besides the $1,200. He told me to go and see his lawyer, and make an arrangement with him. I saw Mr. Jayne, his lawyer, and told him what had passed between Dr. Clark and myself. Mr. Jayne told me, however, that he could not bind Dr. Clark, but that he supposed it would be all right. I saw Dr. Clark the next morning. He came up to the store, and he says: 'Well, Hoeger, I have got a man that will come up here today about noon, and you can leave him in possession of the

store, and you take your agreement, and come and meet me down at the Detroit Savings Bank.' And he says, 'Be sure and bring your agreement along;' and I says, 'All right.' At noon his representative came up to the store, and I turned it over to him, and I went down to the Detroit Savings Bank, and met Dr. Clark there. Dr. Clark asked me whether I had brought my agreement along, and I says, 'Yes,' and he asked me for it, and I gave it to him. He then proceeded to cancel the notes I had given him, and, finding it a rather tedious job, he tore off the signatures, and gave them to me, and he says: 'That is all that we can do here. Come over to the office, and meet me and Mr. Jayne there in the office;' and then we went away, and Dr. Clark went one way and I went another. I went to the office, and met Dr. Clark there, and spoke to him a few minutes, and then the doctor said he had an urgent call he had to attend to at once, and he could not stop to do anything with me, but I could come the next day. I came the next day, and he then made the excuse that he had not been able to do anything yet. He wanted to see his lawyer, and he told me to come again in a day or two, and in that way he kept putting me off three or four times, until finally a week or two had elapsed, and then, when I came again, then he did not say he could do anything for me. He could not make the settlement. He did not know what debts might be owing and what debts would be. He said he could not make a settlement; would have to let it go. The value of the stock and fixtures at that time was about $1,900."

The defendant insists that, at the time he entered into the agreement with Hoeger, he assumed the debt from Hoeger to Farrand, Williams & Clark, amounting to about $700, and that when he took possession of the store there were other amounts due,—for rent $140, a balance of $183 on a soda fountain, a balance of $19 on a show case in the store, and some $60 for electric light and telephone that was unpaid. He claims that possession of the store was voluntarily delivered to him by Hoeger; that he did say, in the presence of Mr. and Mrs. Hoeger, that if the business sold for $1,800 he would make Mrs. Hoeger a present of $300; but that on taking an inventory he

found that the value of the stock and fixtures was less than the debts assumed, and that he finally sold the business to his brother for $1,000. Defendant does not claim that he paid out any money between November 25, 1891, and May, 1892, except that he says that he paid the $50 received from Hoeger upon the debt due Farrand, Williams & Clark. He admits that he refused to pay Hoeger any more than $150. This suit was commenced in 1893. At that time defendant had not paid the Farrand, Williams & Clark claim, but he insists that he had assumed it. In July, 1892, Farrand, Williams & Clark commenced suit against Hoeger upon this claim, and garnished defendant. Defendant disclosed that he owed Hoeger $673. In January, 1894, defendant gave his notes to Farrand, Williams & Clark for the amount of the judgment. Defendant undertakes to explain this suit upon the theory that he was advised that his oral undertaking to pay Farrand, Williams & Clark was not valid, and that it was necessary that a formal suit should be commenced, and witness garnished.

It is unnecessary to detail the errors complained of. No question seems to have been raised on the pleadings. It is evident that the object of the instruments executed November 25, 1891, was, on Hoeger's part, to enable him to pay up his then existing indebtedness and continue his business, and, on defendant's part, to obtain security for advances. It is undisputed that the then existing indebtedness was not paid. The largest claim was that of Farrand, Williams & Clark. It is insisted that defendant assumed that indebtedness, but, whatever defendant did, Hoeger was not released, and, if defendant had been willing to release Hoeger, and Farrand, Williams & Clark had been willing to accept Clark instead, it was entirely unnecessary to have Farrand, Williams & Clark bring suit. The contract was that Clark should furnish the money to discharge the debt. Hoeger was willing to pay to Clark a bonus of $400 (the difference between the $1,200 to be advanced by Clark and the $1,600 which was

to be paid by Hoeger) to relieve the former from these
pressing debts, and to enable him to get credit and con-
tinue his business. The bill of sale was filed in the office
of the city clerk. Unless the agreement was available
for relief, the bill of sale was but an added complication
further affecting Hoeger's credit, and making it more
difficult for him to continue his business. If the stock
and fixtures exceeded in value the $1,600, Hoeger
was injured to that extent, at least, by defendant's fail-
ure to perform.

With reference to the subsequent arrangement, made
in May, 1892, if, as Clark claims, the stock was volun-
tarily turned over to him in satisfaction of his claims,
Hoeger had full knowledge of what had occurred hith-
erto, and there can be no recovery. If defendant
obtained possession promising to assume and pay the ex-
isting claims, and to pay to Hoeger $300 in case the stock
and fixtures sold for $1,800, or if defendant agreed to
take the stock, and agreed to account to Hoeger for the
proceeds over and above his claim and the existing
liabilities, and the defendant, acting in good faith, found
that the amount of the stock and fixtures had been mis-
represented, and did not exceed the amount which had
been advanced and assumed, and he, acting in good faith,
disposed of the stock at its fair market value, and the
proceeds were insufficient to reimburse him, plaintiff can-
not recover. Defendant, however, sold the stock at pri-
vate sale to his brother, in which case the burden is upon
him to show that he acted in entire good faith; and, as
bearing upon that question, all the circumstances attend-
ing the transactions had relating to the property are
material. The papers executed in November, 1891, espe-
cially in view of what transpired subsequently, cannot be
regarded as transferring the absolute title to defendant;
and, if he obtained possession of the store and contents
fraudulently or by overreaching, he is liable to plaintiff
for the value of the stock and fixtures, less the amount

of defendant's lien thereon for disbursements actually made.

Respecting the claim of Farrand, Williams & Clark, it appears that the judgment against defendant as garnishee has been satisfied. That operates as a discharge *pro tanto* of the judgment in the principal suit. Defendant's undertaking was to pay this claim, but at his suggestion and procurement it was put in judgment. Defendant should not be allowed, in any event, an amount in excess of the face of that claim as it stood at the time of the disposal of the stock of goods, exclusive of any interest or costs thereon since accruing.

The judgment is reversed, and a new trial granted.

The other Justices concurred.