[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 290 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 291 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 292 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 293 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 294 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 295 
This is an appeal and cross appeal from an order of the circuit court, upon appeal from probate court, in the matter of the estate of Warner M. Baldwin, deceased. The order appealed from allowed the account of Chester I. Monroe, executor and appellant, after surcharging him with $27,044.69 over and above the amount shown in the account in question. The order assigns the residue, including the surcharges, to the residuary legatees named in the will of the decedent or their successors in title. The persons now entitled to the residue are referred to herein as legatees or residuary legatees. They are the appellees and cross-appellants.
Warner M. Baldwin died June 28, 1925, and his will was admitted to probate in Berrien county, Michigan, on August 7, 1925. The will provided for the payment of debts, legacies and for the distribution *Page 296 
of the residue as well as for the appointment of R.H. Sherwood and Chester I. Monroe as executors. With the exception of a provision in a codicil hereinafter noted, the will fulfilled all of the legal requirements for validity.
At the time of Baldwin's death none of the Baldwin heirs were present and Monroe, a long-time friend and business associate, made the funeral arrangements. After the funeral the will was read to the heirs then present and shortly thereafter the will was filed in probate court. Sherwood and Monroe qualified as executors and gave bond for $75,000. The record discloses that Sherwood was ill and all of the executors' duties were performed by Monroe. The first inventory of the assets of the estate was filed August 15, 1925. On December 14, 1925, hearing on claims was held and certain claims allowed by the probate court. On March 25, 1929, one D.A. Potter, a public accountant, made an audit of the estate (hereinafter known as the Potter audit) and which audit disclosed that the executor had, between 1925 and 1929, paid certain specific bequests and expenses of the estate, made a partial distribution of the residue in the amount of $50,000 to the legatees and had paid $10,000 to executor Monroe in accordance with a codicil of the will. A copy of this audit was mailed to the legatees and a few days later the executors recommended to the legatees that the estate residue was then ready for final distribution. However the legatees failed to communicate with the executors concerning either the audit or the recommendation. This Potter audit was not filed in the probate court. On February 2, 1933, Potter made a second audit which was filed in the probate court. On October 10, 1933, petition was made to reduce executors' bond to $25,000 and seven days later the petition was granted along with an *Page 297 
order granting further time for closing the estate. Two later audits were filed in the probate court, one in 1935 and one in 1937. Final account was filed in the probate court on July 12, 1940, notice of hearing thereon was published but no order allowing that account was ever entered by the probate court. In January of 1942, the appellees and cross-appellants herein objected to allowance of final account whereupon on February 6, 1942, a supplemental final account was filed by the surviving executor Monroe (Sherwood having died in 1935). Hearing on this supplemental account was had, order was duly entered by the probate court, but both parties appealed therefrom.
The controversy was heard and determined in the circuit court. Appellant's appeal from the adjudication in the circuit court concerns eight items either surcharged against the executor or denied to him, while the cross-appellants complain of ten items in the account, incident to which the circuit court did not uphold their contention. With the above brief outline in mind, we now discuss the various items in order, adding such facts as are necessary in each instance.
1. The first and largest item surcharged to the executor is the sum of $10,000 bequeathed to him by Baldwin, which bequest was an item in a codicil attached to the will, designated as codicil number one and reading in part as follows, "Second: I will and bequeath to my friend C.I. Monroe the sum of $10,000." The codicil was signed by Warner M. Baldwin and witnessed by Chester I. Monroe and Francis M. Keasey. Act No. 288, chap. 2, § 7, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 16289-2[7], Stat. Ann. 1943 Rev. § 27.3178 [77]), reenacted the former statute, 3 Comp. Laws 1929, § 13484 (Stat. Ann. § 26.1067), and reads as follows: *Page 298 
"All beneficial devises, legacies and gifts whatsoever, made or given in any will to a subscribing witness thereto, shall be wholly void, unless there be 2 other competent subscribing witnesses to the same."
The legacy of $10,000 to Monroe, a subscribing witness, is wholly void. No payment of this attempted legacy can be valid and any payment made must be returned to the estate. The executor argues that this legacy was really a payment for services rendered by Monroe to Baldwin during his lifetime. While the record discloses that for many years the deceased and Monroe were closely associated as friends and in business, and it is a fair inference that the deceased desired Monroe to receive the $10,000, perhaps for services rendered, yet that reason for granting a bequest does not overcome a statutory provision concerning its validity. The executor must be presumed to know the law and he cannot now be heard to claim that a void bequest is valid on the ground it is a claim for services rendered. If Monroe was entitled to $10,000 for services rendered, he should have presented a claim in that amount against the estate. Failure of legatees to object or to make demand for return of this money to the estate prior to a determination of invalidity by the probate court did not validate that which the statute declares to be void.
Act No. 288, chap. 2, § 96, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 16289-2 [96], Stat. Ann. 1943 Rev. § 27.3178 [166]), provides:
"In such order (of assignment) the court shall state the date of death of the decedent and shall name the persons and the proportions or parts to which each shall be entitled; and such persons shall have the right to demand and recover their respective *Page 299 
shares from the executor or administrator, or any other person having the same or any part thereof, after the expiration of 60 days from the date of such order, unless an appeal shall have been taken therefrom, in which case they shall have the same right immediately upon the final termination of such appeal."
Since the legatees had no right to claim any portion of the residue prior to the order of assignment, no annual accounts by the executor having been submitted and approved, there was no right of the legatees which could be lost by laches on their part or against which the statute of limitations might run.* This item of $10,000 was properly surcharged.
2. The trial court surcharged Monroe with $8,686.50 as interest at 5 per cent. for approximately 17 years since the date Monroe improperly paid himself the $10,000 invalid legacy. There was no attempt by the executor to conceal the payment of this legacy. As early as 1929 the Potter audit advised the legatees of the payment. There seems to have been a mutual mistake on the part of all parties concerned. Not until 1942 did the legatees object to the payment of the $10,000 or claim interest thereon. It is true that an executor may not personally profit from use of the funds of an estate, and he will be held strictly accountable for any conversion of funds plus legal interest. It is the legatees' claim that the sum allowed by the trial court is to be considered as "earnings," not interest, yet the record does not disclose that the sum of $8,686.50 actually represents the sum which the legatees have proved to have been earned by the $10,000 while it was in the personal possession of Monroe. Nor *Page 300 
is there proof that had the $10,000 remained in the corpus of the estate it would have earned any income whatever. Whether an executor is chargeable with interest depends on attendant circumstances. Acquiescence or at least inaction on the part of the legatees is disclosed by the record which shows they made no demand for repayment of the $10,000 legacy (following which demand interest might be held to accrue) until 1942, a period of 13 years after knowledge came to them of attempted payment of the invalid legacy.
The general rule applicable is well stated in Second ThirdStreet Passenger Railway Co. v. City of Philadelphia, 51 Pa. 465, viz:
"The rule seems therefore to be this, that when a mutual mistake occurs between the payer and receiver of a sum of money, by which the whole has not been paid, or too much has been received, interest is not recoverable on the sum so withheld or received, unless it has been unjustly withheld or unjustly received. The party retaining the money by mistake, may well rely on the acquittance received or given, until the injured party makes known his claim and demands correction and payment. After such demand, if it be refused, and it turns out there was money due which ought to have been paid, it will bear interest from demand until paid. If there were concealment or design to mislead and withhold interest, interest would be recoverable for all the time. This is the doctrine of the cases; they turn on an unjust or innocent and mistaken withholding; in the former case interest is recoverable, in the latter it is not."
We therefore hold that the executor should be surcharged with interest on $10,000 only from the date of demand in 1942.
3. Prior to 1929, the executor made a partial distribution of assets to the amount of $50,000 among *Page 301 
the residuary legatees and also, as previously stated, paid himself $10,000 as a legacy. The Potter audit discloses these payments but did not show payment of the inheritance taxes to the State of Michigan. In fact the payment of these taxes was overlooked until 1939 when, after some negotiations with the State, the executor paid out of estate funds the taxes plus $1,796.79 as interest. In addition to the tax and interest on the distribution to the legatees, Monroe also paid out of estate funds the sum of $500 as inheritance tax and $412.15 as interest on the $10,000 which he assumed had been left to him. The trial court surcharged Monroe with the total of these amounts.
Act No. 188, § 3, Pub. Acts 1899 (1 Comp. Laws 1929, § 3675 [Stat. Ann. § 7.564]), reads in part as follows:
"Every such tax and the interest thereon herein provided for shall be and remain a lien upon the property transferred until paid, and the person to whom the property is so transferred and the administrator, executor, and trustee of every estate so transferred, shall be personally liable for such tax until its payment."
In the words of the statute there was a "lien upon the property transferred" ($50,000) to the legatees, and they were primarily charged with the duty to ascertain that the tax was paid and to pay the tax if necessary. The legatees, who made no inquiry, must be presumed to have known this tax was payable. As the legatees failed to act, the executor acted, although belatedly, for them. The inheritance tax and accrued interest should be charged against the legatees. The accrual of interest was due to their own neglect. This item of $1,796.79 cannot properly be surcharged against the executor. *Page 302 
Nor should the executor be surcharged with the $500 paid out of the estate's funds as inheritance tax on the $10,000 legacy which the executor wrongfully assumed he was entitled to receive, and which he in fact paid to himself in 1929. In the distribution of the residue of the estate appellees will receive this item of $10,000 less the $500 inheritance tax paid. Obviously the residuary legatees will reap the benefit of the $500 already having been paid as the inheritance tax on the $10,000; and hence there is no justification for surcharging the $500 inheritance tax against the executor. Provided, however, if this inheritance tax of $500 as charged against a bequest assumed to run to the executor was greater than the tax would have been on this additional distribution to the residuary legatees, then the executor should be charged with such excess. But as to the accrued interest of $412.15 on this item of $500, we are of the opinion it should be surcharged against the executor. We so conclude because the executor wrongfully withheld this $10,000 item from the legatees, who had no intimation that it would ultimately be distributed among them. It must be presumed under the circumstances that it was the executor's wrongful withholding, under a claim of right, this $10,000 item which caused the belated payment of the inheritance tax and resulted in the accrual of the item of $412.15 which was paid out of the estate funds as interest on this belatedly paid inheritance tax. Because the executor's own wrongful conduct necessitated the payment of this item of $412.15, it must be charged against him.
4. The trial court surcharged the executor for excessive bond premiums in the amount of $1,000. At the time the executors qualified, a bond was filed for $75,000 based on an inventory dated August 15, 1925, of $84,590.08. The final account filed July 12, 1940, discloses that bond premiums in the amount *Page 303 
of $1,978.60 had been paid out of estate funds. During the years 1925, 1926 and 1927, the principal distribution to beneficiaries occurred, whereby the residue of the estate was reduced by $62,500. It was not until October 17, 1933, that the executors petitioned for, and the probate court ordered, a reduction of the bond to $25,000. However, the record shows that the bond premium was not reduced until sometime in 1935. The annual premium paid for a $75,000 bond was $156.67 and for a $25,000 bond was $56.67. The amount of the original bond was not excessive and the premium thereon, at least until the principal distributions were made, was a proper charge against the estate. Nor may the legatees complain of the premium on the reduced bond. They were advised by the Potter audit in 1929 of the distribution and yet made no inquiry concerning the handling of the estate. Further it is not unusual that the actual residue in an estate may fall below the amount of the filed bond, and this reason standing alone is not sufficient to warrant surcharging the executor for any excessive bond premium. The record discloses that the principal distributions had been made by the middle or latter part of 1927. The annual term of the bond expired in August each year. The executor had ample time after the distributions of 1927 to petition that the bond be reduced at least beginning in August, 1928. The most that the executors may be charged for negligence in this respect therefore is the difference which the estate actually paid and that which it would have paid had the executor acted with reasonable diligence. During the years 1928 to 1935 the executor paid as bond premiums the sum of $1,203.58. He should have paid only $446.91. He must be surcharged with the difference, $756.67.
5. $499.25 was surcharged the executor by the trial court, which amount was paid on January 19, *Page 304 
1926, by the executor out of estate funds for burial expenses to F.M. Keasey, the undertaker. Among the assets of the estate shown in the original inventory are two notes of the same Mr. Keasey totaling $850, one dated February 2, 1924, and the other March 5, 1921. The executor took no action to collect these notes. Nor did the executor claim that the undertaker's bill of $499.25 should be satisfied by offsetting it against the amount due the estate on the two notes. Act No. 314, chap. 55, § 9, Pub. Acts 1915 (3 Comp. Laws 1929, § 15682), in effect at the time this claim arose, provided:
"When a creditor against whom the deceased had claims shall present a claim to the commissioners, the executor or administrator shall exhibit the claims of the deceased in offset to the claims of the creditor and the commissioners shall ascertain and allow the balance against or in favor of the estate, as they shall find the same to be; but no claim barred by the statute of limitations shall be allowed by the commissioners in favor of or against the estate, as a set-off or otherwise."
At the time of the hearing on claims, December 14, 1925, the Keasey notes were valid claims of the estate against Keasey, and the executors were required, by the above-quoted statute, to present the claim of the estate in offset to the claim of Keasey as creditor. This the executors failed to do. Because of such maladministration this item of $499.25 was properly surcharged.
It is the appellees' claim that the executor should be surcharged with the total of $850 because by negligent failure to make collection, the executors permitted the notes to become void by operation of the statute of limitations. The trial court held against this claim and we affirm that decision. The record is convincing that the probable result of an *Page 305 
action to collect these notes would have been of such doubtful value that we cannot now say the executors were negligent in not prosecuting such action.
6. The trial court surcharged against the executor $500 on an item known as the F.F. Gross mortgage on the ground that the executor was negligent in not collecting this mortgage. It appears that the original inventory carried this mortgage as an asset of the estate and at the full face amount; however, in 1940, the mortgage was inventoried at no value. The mortgage was dated November 5, 1909. In 1929, the executors advised the legatees that the mortgage was well secured, and audits filed in the probate court in 1933, 1935, and 1937 showed the mortgage still on hand, yet the records of the register of deeds show this mortgage was discharged by the executors on June 30, 1934. It is the executor's claim that the mortgage had been paid before Mr. Baldwin's death but the cancelled note and mortgage were not returned to Mr. Gross; and when Mr. Gross produced a receipt purporting to be in Mr. Baldwin's handwriting, the mortgage was discharged by the executors without first petitioning the probate court to authorize such discharge. So far as the record discloses, neither the receipt nor a photographic copy of it was produced in court. Mr. Gross did not testify, nor was his deposition taken in support of the executor's claim. The appellees claim that Gross about 1932 gave a second mortgage to the bank of which executor Monroe was president; that this second mortgage to the bank was foreclosed on May 15, 1933, with the period of redemption expiring on May 15, 1934; so in order that the bank might convey good title not subject to the estate's senior mortgage, it was necessary that the Baldwin mortgage be discharged. The objectors claim this discharge was given without authority and without payment. In *Page 306 
view of the conflicting testimony concerning this item and the executor's failure to properly prove his contention, the action of the trial court must be affirmed.
7. The executor's final account petitioned for the allowance of executor's fees in the amount of $3,000 but failed to give detailed accounting in the way of statutory fees and fees for extraordinary services. This amount was denied in toto by the trial court which based its decision on Burnham v. Kelley,299 Mich. 452. However, the facts in the Burnham Case must be distinguished from those in the present case. In that case at page 464 we said:
"Compensation for such services is based upon the theory that a service well performed should be paid for. In the case at bar, defendant Kelley was cashier of a bank. He served as personal representative for a number of estates and was familiar with probate accounts. Yet with this experience he has manipulated the affairs of the estate to such an extent that it is impossible todetermine the loss to the estate. Under such conditions, we have no hesitation in saying that he has forfeited all rights to compensation."
In the present case the record does not support the appellees' claim that the executor's acts were, in effect, fraudulent nor were the executor's acts such as made it impossible to determine the loss to the estate.
As the claim for fees is in a lump sum, it must be broken down into statutory fees allowable and extraordinary fees. The allowance of fees for extraordinary services is discretionary with the court, see In re Finn's Estate, 281 Mich. 478, andWisner v. Mabley's Estate, 70 Mich. 271. The statutory provision regarding such fees reads in part as follows: "Provided, however, that such allowance shall only *Page 307 
be made upon the filing of a petition therefor, setting forth in detail such extraordinary services, or the reasons for considering the case one of unusual difficulty or responsibility." Act No. 314, chap. 62, § 15, Pub. Acts 1915 (3 Comp. Laws 1929, § 15929 [Stat. Ann. § 27.3108]), reenacted by Act No. 288, chap. 4, § 33, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 16289-4 [33], Stat. Ann. 1943 Rev. § 27.3178 [284]). The executor failed to comply with this provision and any claim for extraordinary services must be disallowed.
The general rule governing the withholding of executor's compensation is well stated in 34 C.J.S. p. 1046, viz: "The general rule is that an executor or administrator who has been guilty of fraud, willful default, gross negligence, or other misconduct in the administration of the estate, by reason of which the estate has suffered detriment, may be deprived of all, or a part of the compensation to which he would otherwise be entitled. * * * Whether or not the misconduct is such as to warrant the refusal of compensation in any particular case is a matter resting within the discretion of the court."
Under this rule, the executor in the present case should be allowed statutory fees** insofar as his handling of the estate funds did not result in a detriment to the estate. The record discloses that up to the Potter audit of 1929, the executor had properly disbursed to legatees the sum of $52,500. As to the handling of this sum, there can be no claim that a detriment to the estate resulted. We therefore allow statutory fees based on this sum and in the amount of $1,100 to the executor.
8. The trial court surcharged the executor in the amount of $650 which sum was declared to be due *Page 308 
the estate as the result of mishandling a real-estate transaction. The appellant's brief consents to this judgment, while the appellees claim that certain expenditures in the way of taxes and foreclosure costs should also be surcharged to the executor. The record fails to support the appellees' claim and the judgment as to this item is affirmed without further discussion of the details of the transaction.
The following items were not surcharged to the executor. As to these items the appellees became cross-appellants and urge that by such denial of their claims, the court was in error.
9. Shortly after decedent died, one Mrs. Wolcott presented a claim for $728 covering board for the years 1911 to 1917 inclusive, which claim was allowed by the probate court. The executor satisfied this claim by a compromise payment of $208, although later on trial he tried to excuse his disregard of the statute of limitations, viz:
"Q. Although you knew the statute of limitations in Michigan was six years, it appeared on its face it was outlawed at the time of Mr. Baldwin's death?
"A. Yes, because I knew he owed the bill.
"Q. You knew it personally?
"A. I did."
Act No. 314, chap. 55, § 9, Pub. Acts 1915 (3 Comp. Laws 1929, § 15682), quoted above, specifically says: "but no claim barred by the statute of limitations shall be allowed by the commissioners in favor of or against the estate, as a set-off or otherwise." The claim of Mrs. Wolcott was, on its face, void by operation of the statute of limitations. The executor could not waive the statute of limitations, see Geisel v. Burg,283 Mich. 73, regardless of the knowledge which he claims to have had regarding the debt. The payment of $208 was an error for which the executor *Page 309 
must be surcharged. The trial court is reversed as to this item.
10. After the death of Mr. Baldwin a claim was filed by one Mrs. Keasey for board and room in the amount of $1,014. This claim was allowed by the probate court and paid by the executor. In addition thereto, the executor paid the same Mrs. Keasey $50 for services rendered to the executor after Mr. Baldwin's death. The objectors argue that these two items are, in effect, fictitious claims made by the executor to "bleed" the estate. However, the appellees have failed to overcome the record proof of the validity of these payments. It would serve no purpose to further discuss the details of these items and we affirm the trial court's refusal to surcharge these two amounts against the executor.
11. and 12. Among the listed assets in the original inventory of the estate was a note by one F.D. Gilchrist, dated June 20, 1924, in the amount of $735.98. The 1940 amended inventory showed this note to be of no value. In 1942, the executor filed in the probate court an explanation relating to (among others) this item, which says that collection was not made because the executor found the note had been paid during the lifetime of Mr. Baldwin. Attached to this explanation is an affidavit by Gilchrist that the note had been paid. Also listed in the assets were several notes of one R.H. Sherwood, totalling $6,020 and all dated during 1924 and 1925. The executor advised the appellees that these notes were of no value as Sherwood was insolvent.
The appellees attack the noncollection of these Gilchrist and Sherwood notes on various grounds, but principally for the reasons that the executor failed to use proper diligence, or that he connived with the debtors to the detriment of the estate, the details of which arguments need not be recited here. *Page 310 
Suffice to say the record is convincing that as to these notes the executor did not act in bad faith or with lack of diligence. While the executor of course had the right to sue on these debts, he was not required to sue on doubtful claims at the risk of waste to the estate. He was only required to use reasonable diligence and good faith. See 23 C.J. p. 1191. The record is not convincing he did otherwise, hence we affirm the judgment of the trial court disallowing claims 11 and 12.
13. The executor's final account shows interest collected in the amount of $4,390.48 with an additional amount of $483 as income being included in the supplemental final account filed February 6, 1942. The appellant claims this is the entire amount of income received from investments. It is appellees' claim that the executor should be charged with additional interest to the amount of about $5,200, being 5 per cent. on amounts claimed to have been carried as "cash on hand." In support of this claim appellees produce some evidence that over a period of years substantially $8,000 of estate funds was in the executor's hands and that at various times all the "cash on hand" was not deposited to the account of the estate, but was being used for investment purposes by the executor. In other words, appellees in the first instance base their claim to interest on the theory that the executor converted the estate funds to his own use and derived an income therefrom for which he has not accounted. This claim is not established by the proofs.
As to whether an executor should be surcharged with interest on funds on hand, as appellees further claim, there is no inflexible rule which courts must follow.
"However, there is no inflexible rule requiring such a charge, and in cases where the executor or *Page 311 
administrator has not actually received interest or used the funds of the estate for his own purposes, and has merely permitted them to lie idle when they might have been productively employed for the benefit of the estate, it is a matter of discretion with the court, on consideration of all the circumstances of the case, whether interest shall be charged." 33 C.J.S. p. 1195, and cases cited.
In the allowance of items of this character as a charge in favor of or against an executor a measure of discretion is vested in the trial court; and it is only when there appears to have been a manifest abuse of such discretion that the decision of the trial court will be overruled. Such was the holding in ReMcNamara's Estate, 166 Mich. 451, which involved allowance of compensation for extraordinary services. In this jurisdiction the prevailing tendency seems to have been to surcharge an executor with interest on funds in his hands which in the exercise of reasonable care and diligence under all the attendant circumstances he might have invested in income-producing securities or deposits but failed to do so. For cases so holding see Hall v. Grovier, 25 Mich. 428; Galloway v. McPherson'sEstate, 76 Mich. 318; In re Brewster's Estate, 113 Mich. 561;In re Saier's Estate, 158 Mich. 170; and In re Grover'sEstate, 233 Mich. 467. But as noted above this is not an inflexible rule; instead, all of the attendant circumstances must be considered and the burden of establishing a right to surcharge the executor is upon those who seek to have him so charged. The record before us does not show in anything like a definite manner the amount of "cash on hand" Monroe had from time to time. It is pointed out in his brief that in his account he charged himself as "cash on hand" with investments in mortgages and that he has accounted for *Page 312 
interest thereon. Further, there is testimony in this case that during the period involved Michigan banks in general were in a precarious condition. Even in the absence of testimony this Court might take judicial notice of such fact. Moore v. CapitalNational Bank of Lansing, 274 Mich. 56; Detroit Trust Co. v.Hockett, 278 Mich. 124. In consequence of such condition the executor, as disclosed by the testimony, kept large portions of the cash on hand in a safety deposit box, rather than on deposit in his bank. Presumably the trial court in refusing to surcharge Monroe with interest that might have been earned at the rate paid on savings accounts, took banking conditions into consideration. Under these circumstances and because of the failure of appellees to produce satisfactory proof of the executor having failed to act in good faith and with reasonable diligence in this particular or of having used estate funds for his own benefit, we do not feel justified in disturbing the finding of the trial judge who disallowed this item of appellees' claim.
14. As previously stated in this opinion, several audits were made of the estate by Mr. Potter, for which fees in the amount of $302 were paid. The appellees contend that not only were these audits of no value and were used by executor to cover up his misdeed, but further that the statute required the executor to himself make an accurate audit. With these contentions we do not agree. This was a complex estate of far greater than normal size. The executor was a banker, not an auditor, and with an estate of this nature, obtaining audits by a professional accountant was not only reasonable but was good judgment. The amount of the fees is not attacked. Certainly no one would have been quicker to criticize the executor than these objectors had the present confusion arisen and the executor had not *Page 313 
obtained the services of an accountant. Disallowance by the trial court of this item is affirmed.
15. Appellant's final account includes an item showing dividend and interest payments received, including dividends on 20 shares of Armour Company preferred stock, par value $2,000. While the final account does not show in detail the dividends received on this stock, the executor testified such dividends from 1933 to 1940 amounted to $726.12. But he also testified that this stock paid 7 per cent. a year, every year with no variations, i.e., $140 per year. These dividends were payable semiannually in June and December. If there was no default in dividend payments, 14 semiannual payments (December, 1933, to June, 1940, inclusive) would total $980. This indicates that the executor failed to account for $253.88. He offered no proof that default had been made in payment of any dividend. In view of the executor's own testimony and with a company of the standing of Armour Company, we must indulge in the presumption, in the absence of a contrary showing, that no default occurred in payments of dividends on this preferred stock. As to this item there is reasonable proof of inaccuracy in the executor's account. We therefore surcharge him with $253.88; provided however, at the executor's option further testimony as to the Armour dividends may be taken after remand to the probate court, and our determination as to this item modified and allowed in the final account in the true amount established by such testimony. We make this provision because as to this item, as well as some others, the record is inexcusably unsatisfactory. As to payment of these dividends definite proof would seem to be easily obtainable. The trial court's disallowance of this item will be modified in accordance herewith. *Page 314 
16. The final account charged $400 as attorney fees for work done by attorneys in connection with inheritance tax difficulties encountered by the executor. It is the appellees' contention that, although the fees are reasonable, they are properly chargeable to the executor and not to the estate. In view of our holding in item 3 above that the interest on the inheritance tax is chargeable to the estate, it follows that the attorneys' services in connection with the settlement of this interest item with the State must be considered for the benefit and on the behalf of the estate, and chargeable to it. The court's refusal to charge the executor with this item was proper.
17. In addition to the above attorneys' fees there is in the final account an additional fee of $658.75 for the same attorneys. This charge was made incident to defending the executor himself from the claim of the legatees that he had mishandled the estate. It was not for the benefit directly or indirectly of the estate, hence this fee is not properly a charge against the estate. Had the executor fully prevailed and been exonerated from all error, a different conclusion might have been reached. However, numerous errors have been proven against the executor and he should personally pay the cost of his own defense. The trial court erred in refusing to surcharge the executor with this item of $658.75.
18. This item concerned an error wherein the executor's account showed possession of one certain bond whereas in fact there are two such bonds in his possession. The error is admitted by the appellant. The judgment of the trial court requiring the executor to account for these two bonds is affirmed.
In so far as it is not in accord with our decision herein the judgment entered in the circuit court is modified and the case remanded for entry of judgment in accordance herewith, and for subsequent *Page 315 
remand to the probate court of Berrien county for further proceedings. Neither of the parties to this suit fully succeeded in substantiating the claims made by them respectively either in the circuit court or in this Court; and all parties concerned have failed to exercise reasonable diligence in the administration of this estate. For these reasons neither party will recover taxable costs in the circuit court or in this Court.
STARR, C.J., and WIEST, BUTZEL, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.
* See 3 Comp. Laws 1929, § 13976, as amended by Act No. 193, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 13976, Stat. Ann. 1944 Cum. Supp. § 27.605). — REPORTER.
** See Act No. 288, chap. 4, § 33, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 16289-4 [33], Stat. Ann. 1943 Rev. § 27.3178 [284]). — REPORTER.