## BERNER v. EQUITABLE OFFICE BLDG. CORPORATION et al.

No. 230, Docket 21278.

United States Court of Appeals
Second Circuit.

Argued April 13, 1949.

Decided June 6, 1949.

Julian S. Bush, New York City, T. Roland Berner, Julian S. Bush, M. Victor Leventritt, New York City, of counsel, for appellant.

Irving L. Schanzer, New York City, and Henry S. Hooker, New York City, for J. Donald Duncan, trustee.

Douglass Newman, New York City, for Equitable Office Bldg. Corporation.

Frederick T. Finnigan, New York City, for Security & Exchange Commission.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Chief Judge.

This is an appeal from an order in bankruptcy which denied any allowance to Berner, the appellant, as attorney for the shareholders of the Equitable Office Building Corporation, the debtor in a corporate reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. The application was one of a number, all of which Judge Knox passed upon in a single opinion, reported in 83 F.Supp. 531, under the title "In the Matter of Equitable Office Building Corporation". We shall assume a familiarity with that part of it which he entitled "Application of T. Roland Berner," and in so far as our discussion does not indicate the contrary, we accept his findings. We understand that he based his denial of any allowance to Berner upon § 249, 11 U.S.C.A. § 649, although he did not expressly say so; and possibly he thought that Berner's conduct had forfeited any rights to an allowance upon general equitable principles. As will appear, we hold that there was no proof of conduct which necessarily forfeited his rights either under § 249, or upon general equitable principles; but that there was proof of conduct which required his allowance to be reduced in an amount which the district court should fix in its discretion, and which might go so far as to extinguish any allowance whatever. Since it is clear that Judge Knox did not act upon this theory, we are reversing the order and remanding the case

in order that the district court may exercise the discretion we mention.

■ The first of the two grounds on which any allowance is challenged arises out of the purchase of 20,000 shares of the stock by Peter Bell on July 10th, 1946. Judge Knox did not find that Berner acquired any interest in these shares, then or later; but he was "far from satisfied" that the testimony of Berner and Bell as to the purchase was correct; for he thought that it had "not been adequately demonstrated that the true ownership of the shares was in Peter and Saul Bell," and he felt that he "need not do more than enumerate those details of the testimony which cause my doubts." [83 F.Supp. 565] Therefore we must take it that Berner did not affirmatively establish that he did not acquire an interest in the shares, but that the trustee and the S.E.C. did not establish that he did. However, he did find that before Berner dined with Bell on July 8th, he had already been retained by Buckner or Doyle as his attorney. Berner's testimony was that at that time he had been retained only by Buckner, and that that retainer expired soon thereafter; but it makes no difference by whom he was retained, because he was thereafter continuously acting as attorney for at least one member of the class of shareholders as a whole, and from June 8th forward he was in a fiduciary relation, not only as to his particular clients, whoever they were, but as to all the shareholders. Section 249 clearly presupposes this, and it would follow anyway from the fact that any allowance must come out of the debtor and therefore out of all the shareholders. Indeed, it is the rule in any reorganization under Chapter X that, whenever anyone undertakes to act on behalf of any part of a class, he becomes the representative of the whole class, and may not deal for any part of it alone.[1]

■ Whether Berner's connection with Bell's purchase was within § 249 depends upon whether he had the burden of proving that he did not acquire any interest in the 20,000 shares; or whether that burden rested on the trustee and the S.E.C. It was the rule in equity, when an agent or fiduciary filed his accounts, and the principal or beneficiary had either "falsified" the credits, or "surcharged" the receipts, that the agent or fiduciary had the burden of establishing the credits and the principal or beneficiary the burden of establishing the surcharges.[2] When an attorney files a petition for the payment of his services, he states their character, the time spent, the questions involved, the hazard of success, the amount at stake, the arduousness of the work and the benefits to the beneficiary. Since this is what he must allege and prove, it may be argued, in analogy with the rule we have just mentioned, that, when his services are challenged on the ground that while he was rendering them his loyalty was divided, the burden should rest upon him to prove that it was not divided. The argument would be that the loyalty of the attorney was as much a part of the quality and character of the services, as his competency or assiduity. "The claimant, however, has the burden of proving their worth. Furthermore, 'reasonable compensation for services rendered' necessarily implies loyal and disinterested service in the interest of those for whom the claimant purported to act."[3] In cases where the attorney's right to an allowance is challenged because of an interest that conflicts with that of the class which he represents, it may conceivably be true that the burden does rest on him to prove that no such conflict existed: arguendo, we shall so assume. However, § 249 covers other situations than those in which services are rendered with a divided loyalty; it also forfeits any right to an allowance, if the attorney acquires the interest of any member of a class which he has undertaken to represent, although that acquisition may not, and ordinarily will not, impair his loyalty to the other members of the class. That was the situation here; even though Berner did buy the shares of some shareholders, that did not impair his loyalty to the others; it was a wrong limited to those who sold. Indeed, as to other

[1] Young v. Higbee Co., 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890.
[2] McManus v. Sawyer, D.C., 231 F. 231.
[3] Woods v. City National Bank, 312 U. S. 262, 268, 61 S.Ct. 493, 497, 85 L.Ed. 820.

members of the class, such a purchase would tend rather to increase his loyalty, since he had acquired an interest of his own which was coincident with theirs; and the burden of disproving it ought not to be thrown upon him. For these reasons we conclude that in the case at bar the trustee and the S.E.C. had the burden of proving that Berner did acquire an interest in Bell's shares; and that, since they did not succeed in doing so, § 249 does not forfeit Berner's claim to all compensation.

■ On the other hand, we think that what Berner told Bell on the evening of July 8th amounted to giving him an opportunity to buy the shares at an unlawful advantage over the shareholders from whom he bought, and that this was a breach of trust. It is true that Judge Knox made no finding upon this, but the testimony of both Berner and Bell leaves us in no doubt that, although Berner may also have hoped to get Bell into the underwriting, he intended to give him the opportunity of which we have just spoken. The substance of Berner's testimony is as follows: "I discussed the situation with Mr. Bell, what I thought about the plan, that I was sure that I could stop it, and I was sure that I could get some one to come in and underwrite this at $6 a share, $4.50 a share, and, as a matter of fact, when I talked to Mr. Bell and with the then-issued stock selling at 12, * * * he said 'Do you mind if I buy any?'" To this Berner said that he answered: "I have no objection, but * * * if you do anything in this connection I would rather you did it through Walker Buckner" who had brought Berner into "the situation." Berner himself could see no distinction between this and giving Bell "advice and consultation" to buy the shares, and said that Bell "certainly had had advice from me when he first consulted with me." Bell's testimony was substantially the same: he said that Berner told him of the reorganization and "that there was a placing of new issue which would increase the value of the stock * * * and I asked if I could buy it and he said he had no objection." He went to Buckner's firm because Berner suggested it, and he told them that he was Berner's brother-in-law, for he "knew they would accept my order * * * because I would mention Mr. Berner's name." Saul Bell, Peter's brother, did not cavil at describing as a "tip" the advice which Peter gave him and on which he joined in the purchase.

■ It is the duty of every fiduciary to get the best price he can upon the sale of any part of the trust property; and he is guilty of a breach of trust, if, expecting him to act upon it, he gives a third person information which is unknown to the beneficiary, and which enhances the value of the property. A doubtful case is indeed that of a director, who, being free himself to buy shares, may probably in many situations advise his friends or relatives to do the same. The law is not clear; and in any event there is a valid reason for allowing a director to buy shares for himself, which does not extend to informing outsiders of the facts on which he is personally free to act; for it is usually of interest to a corporation to have a director increase his stake in it. Be that as it may, in the case of ordinary trusts, not only may the trustee not buy in the property for himself, but he may not allow a third person to purchase at a price lower than concealed facts will justify, and he is accountable if he does.[4] The fact that the third person is a relative is not determinative, but it is evidence of this favoritism, varying in importance with the nearness of the connection; and indeed, in some jurisdictions a purchase by the trustee's wife is ipso facto invalid.[5] We have cited in the margin a number of decisions where the question has come up, not because any one is on all fours with the case at bar, but to show how the courts have dealt with the issue.[6]

Even were this not a general principle

---

[4] Scott on Trusts, § 170.6.
Restatement of Trusts, § 170, Comments e, p and r.
[5] In re Midland United Co., 3 Cir., 159 F.2d 340.
[6] Oberlin College v. Fowler, 10 Allen

545, 92 Mass. 545; Duffie v. Clark, 106 Mich. 262, 64 N.W. 57; Gaver v. Gaver, 176 Md. 171, 4 A.2d 132; Piatt v. Longworth's Devisees, 27 Ohio St. 159; In re Minch's Will, Ohio App., 71 N.E.2d 144; Istocin's Estate, 126 Pa.Super. 158, 190

of the law of trusts, since Congress has seen fit in corporate reorganizations to impose so drastic a penalty as the forfeiture of all compensation upon any purchase whatever by an attorney—or other fiduciary—on his own account, we should fail to give proper scope to that purpose, if we were to say that he might freely favor a relative, or indeed even a friend, with information of a probable rise in price of the debtor's shares which was unknown to the shareholders. We hold that this is what Berner did, and that in so doing he committed a breach of trust to the shareholders of whom Bell bought. Nevertheless, since Congress limited the penalty of entire forfeiture to purchases by a fiduciary, we should not be warranted in extending that penalty to the situation at bar; and we think that the consequences should be only those which attend any breach of trust in equity: i. e., that in determining what the trustee's compensation shall be, the court will, as a matter of discretion diminish the allowance which it would otherwise make, in proportion to the gravity of the breach.[7] The decisions on this issue necessarily vary greatly; we cite some of them in the margin.[8] Comment c to § 243 of the Restatement states five factors, and these may be taken as a guide—not, indeed, exhaustive, but not without persuasive value. As neither the allowance itself, nor any reduction because of the breach, is for us, we shall not indicate what either should be, except merely to suggest, though not to require, that in any event the reduction may well be not less than the loss to the sellers of whom Bell bought the 20,000 shares. The fact that the reduction will not reimburse them is not relevant; he owed as much unimpaired loyalty to them as he did those who did not sell, and entire faithlessness to a few of his beneficiaries may as greatly diminish the value of his services as a divided loyalty to all. Whether the breach in this case would justify a total disallowance as matter of discretion, we do not undertake to say.[9]

Lastly, as to the participation of the Hanover Trading Corporation in the two underwritings. That corporation was wholly owned by Berner's mother-in-law, and it had a substantial interest in the commission as the price of underwriting those shares for which the shareholders did not subscribe. While the commission was not therefore a gratuity, it was an opportunity for profit and offered as such; and, although § 249 did not forbid it, we think that it was incumbent upon an attorney at some stage of the proceeding to inform the court that he was so closely interested, even though it was only personally and not financially, in the underwriting. However, there was nothing unlawful as such in the participation of the Hanover Trading Company; its connection with Berner subjected the underwriting to scrutiny by the court, but the court might accept it. We adhere to our decision in Cromwell v. Curtis.[10] In the case of the second underwriting Berner's letter of July 16, 1947, to the S.E.C. was a complete disclosure; in the case of the first underwriting it does not appear that the time had yet passed within which he was called upon to disclose it; for all we know he would have acted as he did in the second underwriting. For these reasons we hold that his allowance should not be reduced because of the participation of the Hanover Trading Corporation in either underwriting.

So far as the disbursements are proved to have been necessary to putting through the plan, it seems to us that they

A. 382; Setaro v. Pernigotti, 105 Conn. 685, 136 A. 571; Matter of Segal's Estate, 170 Misc. 673, 11 N.Y.S.2d 306.

[7] Restatement of Trusts, § 243.

[8] In re McLellan's Estate, 35 Cal.App. 2d 18, 94 P.2d 408; McLellan's Estate v. McLellan, 8 Cal.2d 49, 63 P.2d 1120; Shulkin v. Shulkin, 301 Mass. 184, 16 N. E.2d 644, 652, 118 A.L.R. 629; Townsend v. Townsend, 243 Mass. 401, 137 N. E. 918; In re Baldwin's Estate, 311 Mich. 288, 18 N.W.2d 827; McInnes v. Gold-thwaite, 94 N.H. 331, 52 A.2d 795, 171 A. L.R. 1414; In re Walsh's Ex'rs, 126 Misc. 479, 214 N.Y.S. 167; In re Chambers' Estate, Ohio App., 36 N.E.2d 175, 183; East & West Coast Service Corp. v. Papahagis, 344 Pa. 188, 25 A.2d 341; Cannon v. Searles, 150 Va. 738, 143 S.E. 495.

[9] Crites, Incorporated v. Prudential Insurance Co., 322 U.S. 408, 64 S.Ct. 1075, 88 L.Ed. 1356.

[10] 2 Cir., 99 F.2d 810.

should be regarded as having benefitted the shareholders as a body, and should be allowed.

Order reversed and cause remanded for further proceedings in accordance with the foregoing.