**Lansing, Michigan**

# Opinion

Chief Justice:            Justices:
Robert P. Young, Jr.   Michael F. Cavanagh
                          Marilyn Kelly
                          Stephen J. Markman
                          Diane M. Hathaway
                          Mary Beth Kelly
                          Brian K. Zahra

FILED AUGUST 3, 2012

S T A T E   O F   M I C H I G A N

SUPREME COURT

STAND UP FOR DEMOCRACY,

       Plaintiff-Appellee,

v                                                                No. 145387

SECRETARY OF STATE and BOARD OF
STATE CANVASSERS,

       Defendants,

and

CITIZENS FOR FISCAL
RESPONSIBILITY,

       Intervenor-Defendant-
       Appellant.

BEFORE THE ENTIRE BENCH

MARY BETH KELLY, J.

This case requires that we determine whether to grant a writ of mandamus in favor

of plaintiff, Stand Up For Democracy, to compel the Board of State Canvassers to certify

plaintiff's referendum petition for inclusion on the November 2012 ballot.  Intervening

defendant, Citizens for Fiscal Responsibility, challenged the certification of plaintiff's referendum petition, alleging that it failed to comply with the type-size requirement of MCL 168.482(2) and that the doctrine of substantial compliance, whereby technical deficiencies are resolved in favor of certification, did not apply. The Court of Appeals agreed with both assertions, but concluded it was required to follow its decision in *Bloomfield Charter Township v Oakland County Clerk*[1] and conclude that the petition substantially complied with the type-size requirement of MCL 168.482(2) and that certification was required. Consequently, the Court of Appeals directed the board to certify the petition.[2]

However, because MCL 168.482(2) uses the mandatory term "shall" and does not, by its plain terms, permit certification of deficient petitions with regard to form or content, a majority of this Court holds that the doctrine of substantial compliance is inapplicable to referendum petitions submitted for certification. Therefore, we reverse the Court of Appeals' judgment in this regard and we overrule *Bloomfield Charter Twp*.

Three justices of this Court further conclude that the type-size requirement of MCL 168.482(2) requires that the "type," not the "letters," of the petition heading measure 14 points. Because the Court of Appeals held that plaintiff failed to actually comply with the type-size requirement of MCL 168.482(2) given that the letters did not

---

[1] *Bloomfield Charter Twp v Oakland Co Clerk*, 253 Mich App 1; 654 NW2d 610 (2002).

[2] *Stand Up For Democracy v Secretary of State*, ___ Mich App ___; ___ NW2d ___ (2012). The Court of Appeals sought to convene a conflict panel, MCR 7.215(J)(2) and (3), but a majority of the Court declined to convene the panel in an order entered June 14, 2012. *Stand Up For Democracy v Secretary of State*, ___ Mich App ___ (2012).

measure 14 points, we would also have reversed that portion of the Court of Appeals' judgment.

Because a majority of this Court holds that a new writ of mandamus should enter directing the Board of State Canvassers to certify plaintiff's petition as sufficient, a majority of this Court directs the Board of State Canvassers to certify plaintiff's petition for the ballot. Pursuant to MCR 7.317(C)(3), we direct the Clerk of the Court to issue the judgment order forthwith.

## I. FACTS AND PROCEDURAL HISTORY

On February 29, 2012, plaintiff filed its referendum petition to invoke a referendum with regard to 2011 PA 4, MCL 141.1501 *et seq.*, the emergency financial manager law, and to request certification of the petition from the Board of State Canvassers.[3] The petition contained 203,238 valid signatures, well exceeding the number

---

[3] The people's power of referendum is a constitutional right. Const 1963, art 2, § 9 provides, in relevant part:

> The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. . . . The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the . . . referendum, petitions signed by a number of registered electors, not less than . . . five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

> No law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election.

3

necessary to certify the petition and to place the referendum on the November 2012 ballot. On March 14, 2012, plaintiff submitted its printer's affidavit attesting that the petition heading was "PRINTED IN CAPITAL LETTERS IN 14-POINT BOLDFACE TYPE[.]"

On April 9, 2012, intervenor filed a challenge to the form of plaintiff's referendum petition, asserting, in part, that the heading, "REFERENDUM OF LEGISLATION PROPOSED BY INITIATIVE PETITION," did not comply with the requirement of MCL 168.482(2) that the heading be "printed in capital letters in 14-point boldfaced type . . . ."

The Board of State Canvassers considered intervenor's challenge on April 26, 2012. At the hearing, intervenor asserted that the form and content requirements of MCL 168.482(2) are mandatory. Intervenor submitted two affidavits of two printers who reviewed the petition and stated that the petition was deficient because its heading did not measure 14-point type. Plaintiff countered that the board should apply the doctrine of substantial compliance and approve the petition and, alternatively, that its petition actually complied with the type-size requirement of the statute. Plaintiff relied on its printer's affidavit, as well as the expert testimony of two printers, in support of its

---

Once the Board of State Canvassers makes its official declaration of the sufficiency of a referendum petition and certifies the petition, the law subject to the referendum is no longer effective. See MCL 168.477(2) ("[A] law that is the subject of the referendum continues to be effective until the referendum is properly invoked, which occurs when the board of state canvassers makes its official declaration of the sufficiency of the referendum petition.").

4

argument. Plaintiff also criticized one of intervenor's expert's affidavits for simply measuring one of the capital letters in the heading.

At the close of the hearing, two members of the board voted in favor of a motion to certify the petition, reasoning that "there was more than substantial compliance, . . . there was total compliance." The remaining two board members voted to deny the motion, believing there to be a "legitimate question as to the size of the words" and reasoning that substantial compliance is insufficient under MCL 168.482(2) given its mandatory language. Consequently, the board did not approve the motion to certify the petition.

Plaintiff then filed a complaint for mandamus in the Court of Appeals, requesting the Court to order defendants, the Board of State Canvassers and the Secretary of State, to certify the petition for inclusion on the November 2012 ballot because the board had a clear legal duty to certify the petition, because plaintiff either substantially or actually complied with the 14-point-type statutory requirement. The Court of Appeals first ruled that "the Calibri font utilized in plaintiff's petition heading is smaller than the prescribed 14-point type measurement of 14/72 inches."[4] Without defining the term "type," the panel reasoned that "text that does not measure 14 point, or 14/72 inches, is insufficient under the statute."[5] The Court of Appeals, however, concluded that it was bound to follow *Bloomfield Charter Twp* and concluded that plaintiff's petition had substantially

---

[4] *Stand Up For Democracy*, ___ Mich App at ___; slip op at 12.

[5] *Id*. at ___; slip op at 12.

5

complied with MCL 168.482(2).[6] The Court therefore granted plaintiff's complaint for a writ of mandamus, compelling inclusion of the referendum on the ballot.

We granted oral argument on the application for leave to appeal to consider "(1) whether plaintiff actually complied with the 14-point type requirement in MCL 168.482(2), specifically given the terms 'point' and 'type;' and (2) if not, whether substantial compliance with the 14-point type requirement in § 482(2) is sufficient to give plaintiff a clear legal right to certification of the petition."[7] In lieu of granting leave to appeal, pursuant to MCR 7.302(H)(1) a majority of this Court concludes that the Court of Appeals' judgment is reversed, that substantial compliance is insufficient to certify plaintiff's petitions, and we issue a writ of mandamus, directing the Board of State Canvassers to certify plaintiff's petition as sufficient.

## II. STANDARD OF REVIEW

We review for an abuse of discretion a court's decision to issue or deny a writ of mandamus.[8] This dispute also involves a question of statutory interpretation, which we review de novo.[9] "[O]ur primary task in construing a statute, is to discern and give effect to the intent of the Legislature."[10] The words of the statute are the most reliable evidence

---

[6] *Id*. at ___; slip op at 12.

[7] *Stand Up For Democracy v Secretary of State*, 491 Mich ___ (2012).

[8] *Casco Twp v Secretary of State*, 472 Mich 566, 571; 701 NW2d 102 (2005).

[9] *People v Kolanek*, 491 Mich 382, 393; ___ NW2d ___ (2012).

[10] *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999).

6

of the Legislature's intent and we must give each word its plain and ordinary meaning.[11] "In interpreting the statute at issue, we consider both the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.'"[12]

### III. ANALYSIS

This appeal concerns a big constitutional issue, even though its focus is something as small as 14/72 of an inch. This matter turns on what many citizens may regard as a trivial issue: Whether a heading on a petition signed by over 200,000 people satisfies the statutory requirement that the petition heading be in "14-point boldfaced type[.]"[13] As technical as this appears, the rule of law is implicated here because this issue concerns the constitutional foundation of how we govern ourselves.

Although we colloquially call ourselves a "democracy," we are not. We are a constitutional *republic* in which we, as Michigan citizens, elect our representatives to local and state legislative bodies to enact our laws. This republican form of government is guaranteed to us in the United States Constitution.[14]

In Michigan, we have enacted into our State Constitution an exception: The right of the people by initiative or referendum *directly* to enact laws or to repeal those validly

---

[11] *Krohn v Home-Owners Ins Co*, 490 Mich 145, 156; 802 NW2d 281 (2011).

[12] *Sun Valley Foods Co*, 460 Mich at 237, quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995).

[13] MCL 168.482(2).

[14] Article IV, § 4 of the United States Constitution states: "The United States shall guarantee to every State in this Union a Republican Form of Government . . . ."

enacted by our Legislature.[15] Thus, as plaintiff seeks here, it is possible for a small minority of citizens to suspend a validly enacted law and require that that law be voted on in a general election. This case well demonstrates that tension between constitutional interests: the right to a republican form of government versus a constitutional process that allows a small minority to suspend the enactments of that government.

In the very constitutional provision creating this right of petition by initiative and referendum, the Legislature is required to prescribe the rules by which such petitions may validly be made.[16] It has done so, and one such provision is the mandatory 14-point-boldfaced-type requirement that is challenged here.[17] No doubt in most ordinary circumstances whether a heading is in 14-point or 12-point type would be an inconsequential issue. But, because the power of referendum affects duly enacted laws, these so-called "trivial" requirements protect the citizens of Michigan from having their laws suspended by small factions—*unless the petitioners satisfy all the requirements for invoking a referendum.*[18] With these principles in mind, we turn to the statutory requirement that the petition heading "shall be . . . printed in capital letters in 14-point boldfaced type[.]"[19]

---

[15] Const 1963, art 2, § 9.

[16] Const 1963, art 2, § 9 ("The power of referendum . . . must be invoked in the manner prescribed by law . . . .").

[17] MCL 168.482(2).

[18] See *Thompson v Secretary of State*, 192 Mich 512, 522-523; 159 NW 65 (1916).

[19] MCL 168.482(2).

8

## A. SUBSTANTIAL COMPLIANCE

Plaintiff first suggests that the statutory scheme allows for certification of a referendum petition if that petition substantially complies with MCL 168.482.[20] The applicable statutory provision, MCL 168.482(2) provides:

> If the measure to be submitted proposes a constitutional amendment, initiation of legislation, or referendum of legislation, the heading of each part of the petition *shall be* prepared in the following form and printed in capital letters in *14-point boldfaced type*:

> \* \* \*

> REFERENDUM OF LEGISLATION

> PROPOSED BY INITIATIVE PETITION[21]

The Legislature's use of the term "shall" "'indicates a mandatory and imperative directive.'"[22] Nowhere does the language of this provision indicate that compliance with the 14-point-type requirement may be achieved despite deficiencies. Indeed, other

---

[20] The partial dissent of Justices CAVANAGH, MARILYN KELLY, and HATHAWAY claims that it is "unnecessary," *post* at 3, to rule on the issue of substantial compliance. However, the Court of Appeals treated this case as one involving substantial compliance and analyzed the doctrine in detail. Indeed, the basis for the Court of Appeals' grant of mandamus was its conclusion that plaintiff had substantially complied with the type-size requirement of MCL 168.482(2). This Court, therefore, has the responsibility to obviate any doctrinal confusion regarding substantial compliance before analyzing the Court of Appeals' ruling. Thus, the justices concluding that substantial compliance is insufficient are not reaching an "unnecessary" issue, but are instead correcting an error of law that pervaded the Court of Appeals' decision and was essential to its ruling.

[21] Emphasis added.

[22] *Mich Ed Ass'n v Secretary of State (On Rehearing)*, 489 Mich 194, 218; 801 NW2d 35 (2011), quoting *Burton v Reed City Hosp Corp*, 471 Mich 745, 752; 691 NW2d 424 (2005).

9

provisions of the Michigan Election Law, MCL 168.1 *et seq.*, demonstrate that the Legislature knows how to construct language specifically permitting substantial compliance with regard to form and content requirements.[23] Similar language is conspicuously absent from MCL 168.482(2) and demonstrates a clear intent that petitions for referendums, voter initiatives, and constitutional amendments strictly comply with the form and content requirements of the statute. This conclusion is further supported by the Legislature's 1965 amendment of MCL 168.482, which omitted language that specifically permitted substantial compliance but retained the mandatory requirement that the petition heading be in 14-point type.[24] Indeed, the use of the mandatory term "shall" in MCL 168.482(2), in the absence of any language indicating that substantial compliance with the statute's requirements suffices, indicates a clear intent that such a petition must strictly comply with the type requirement. Consequently, substantial

---

[23] See MCL 168.303(2) (the "nominating petition shall be substantially in the form prescribed in section 544c"); MCL 168.546 ("nominating petitions . . . must comply substantially with the above form"); MCL 168.590a(1) (a "qualifying petition shall be . . . in substantially the same form as provided in section 590h"); MCL 168.590h(2) ("the qualifying petition form shall be substantially as set forth in section 544c"); MCL 168.653a(1) ("notice [of a special election] shall be in substantially the following form"); MCL 168.685(3) ("[new political party] petitions shall be in substantially the following form"); MCL 168.697 (the "names of the several offices to be voted for shall be placed on the ballot substantially in the following order"); MCL 168.759(5) (an "absent voter ballot application shall be in substantially the following form"); MCL 168.761(4) (the "clerk shall enclose with the ballot . . . a printed statement in substantially the following form"); MCL 168.952a ("A person may print his or her own recall petitions if those petitions comply substantially with the form prescribed by the secretary of state and the requirements of section 544c(2).").

[24] Compare MCL 168.482, as amended by 1954 PA 116 (which included the phrase "type of the approximate size set forth"), with MCL 168.482, as amended by 1965 PA 312 (which omitted that phrase).

compliance with MCL 168.482(2) is not permitted.  To certify a petition that does not strictly comply with the requirements of MCL 168.482 on the basis that it substantially complied with the statutory requirements would defeat the Legislature's intent.  However, "our judicial role precludes [us from] imposing different policy choices than those selected by the Legislature"; rather, we must apply the terms as written.[25]

Plaintiff, however, also relies on MCL 168.544d, which provides that petitions circulated countywide "shall be substantially as provided in [MCL 168.482] . . .."  Plaintiff asserts that this provision adopts the substantial compliance doctrine and permits certification of nonconforming referendum petitions.  Because plaintiff circulated its petition countywide, MCL 168.544d is applicable.  That provision provides:

> Nominating petitions for the offices under this act and petitions for a constitutional amendment, initiation of legislation, or referendum of legislation or a local proposal may be circulated on a countywide form. *Petitions circulated countywide shall be on a form prescribed by the secretary of state, which form shall be substantially as provided in sections 482*, 544a, or 544c, whichever is applicable.  The secretary of state may provide for a petition form larger than 8–1/2 inches by 13 inches and shall provide for identification of the city or township in which the person signing the petition is registered.  The certificate of the circulator may be on the reverse side of the petition.  This section does not prohibit the circulation of petitions on another form prescribed by this act.

By its plain language, this provision permits the *Secretary of State* to prescribe a form that itself "substantially" complies with the requirements of MCL 168.482.  Thus, to the extent that MCL 168.544d permits substantial compliance, it only permits the Secretary of State to prescribe petition requirements that are in substantial compliance

---

[25] *People v McIntire*, 461 Mich 147, 152; 599 NW2d 102 (1999) (quotation marks and citation omitted).

with MCL 168.482, MCL 168.544a, or MCL 168.544c of the Michigan Election Law. Contrary to plaintiff's contention, the statute does not allow a petitioner itself to determine what substantially complies with the applicable election law requirements. The Legislature only provided the Secretary of State with that discretion.

More significantly, the Secretary of State's prescribed form, as permitted by MCL 168.544d, mandates strict compliance with the Legislature's mandate in MCL 168.482(2) that the heading of a referendum petition be printed in 14-point type.[26] Accordingly, MCL 168.544d does not constitute a broad substantial compliance provision, as plaintiff would have us interpret it. Because the Secretary of State's prescribed form mandates strict compliance with MCL 168.482(2), plaintiff's reliance on MCL 168.544d is unavailing.

In the absence of statutory language supporting the substantial compliance doctrine, plaintiff nevertheless posits that Michigan caselaw provides a general substantial compliance exception to the mandatory requirements of the Michigan Election Law. Plaintiff principally relies on *Bloomfield Charter Twp* for the proposition that Michigan courts have allowed issues to be placed on the ballot despite the existence of technical deficiencies in form and content. Although a lineage of Michigan Court of Appeals cases exists applying the substantial compliance doctrine before an election, we

---

[26] See Memorandum from the Secretary of State, Initiative and Referendum Petitions – Prescribed Format (Revised June 2011). The Secretary of State's prescribed format requires that a referendum petition's heading "shall be printed in capital letters in 14-point boldface type on the left margin of the signature side of the sheet or at the top of the signature side of the sheet." *Id*. Clearly, the Secretary of State has not relaxed the type-size requirement of MCL 168.482(2).

are unwilling to follow this line of cases and adopt a general substantial compliance exception because such a rule is inconsistent with the statutory scheme as well as our jurisprudence.[27]

In *Bloomfield Charter Twp*,[28] a group of developers filed annexation petitions with the county clerk, who certified the petitions and scheduled a referendum election regarding annexation. The township sought to enjoin the election and also alleged, in part, that the annexation petitions failed to comply with MCL 168.488, which requires that annexation petitions meet the requirements of MCL 168.482(1) and (4) through (6). The circuit court denied the township's request for injunctive relief and concluded that certification of the petitions was proper because "'any technical deficiencies in the petitions are not material . . . .'"[29] Approximately a year later, after voters had approved the annexation, the Court of Appeals affirmed the circuit court's ruling. The Court

---

[27] Notably, our caselaw has consistently recognized the availability of substantial compliance if a petition is challenged in the post-election context. See footnote 33 of this opinion. Court of Appeals jurisprudence, however, has ignored the significance of the distinction between pre-election and post-election petition challenge cases. For example, in *Settles v Detroit City Clerk*, 169 Mich App 797; 427 NW2d 188 (1988), a pre-election challenge to an initiative petition in a home rule city, the Court cited post-election caselaw to hold that "all doubts as to technical deficiencies or failure to comply with the exact letter of procedural requirements in petitions . . . are resolved in favor of permitting the people to vote and express a choice on any proposal subject to election." *Id.* at 802-803, citing *Meridian Charter Twp v East Lansing*, 101 Mich App 805; 300 NW2d 703 (1980). Likewise in *Bloomfield Charter Twp*, technically a post-election case, the Court cited cases involving both pre- and post-election challenges for the same proposition, citing both *Meridian Charter Twp* and *Settles*.

[28] *Bloomfield Charter Twp*, 253 Mich App 1.

[29] *Id*. at 18.

13

acknowledged that the annexation petitions were technically deficient under the statute, and reasoned that it would apply "the doctrine [of substantial compliance] in this case involving imperfect petitions, absent the Legislature's instruction that a petitioned-for election will be precluded unless the initiating petitions exactly match the Michigan Election Law requirements for form and content."[30] The Court, therefore, affirmed the circuit court and concluded that it had properly found substantial compliance and had correctly refused to permit the minor defects to preclude the election.[31]

*Bloomfield Charter Twp* is overruled to the extent that it stands for the proposition that substantial compliance with mandatory petition requirements compels the pre-election certification of a technically deficient petition. Clearly, *Bloomfield Charter Twp*'s reasoning is contrary to the plain language of MCL 168.482(2), which we have explained contains a mandatory 14-point-type requirement. A nonconforming referendum petition cannot be certified for inclusion on the ballot because that result is contrary to the Legislature's intent that petitions strictly conform to the requirements of MCL 168.482. Simply because the Legislature has not included an explicit instruction that "a technically imperfect petition necessarily precludes an election regarding the matter therein addressed," does not mean that the Legislature intended inclusion of deficient petitions as *Bloomfield Charter Twp* reasoned.[32] *Bloomfield Charter Twp* inferred too much from the legislative silence and effectively ignored the mandatory

---

[30] *Id*. at 23.

[31] *Id*. at 25.

[32] *Id.* at 22.

14

language that the Legislature chose to use when stating the form and content requirements of MCL 168.482.

Moreover, while this Court has recognized application of the substantial compliance doctrine to mandatory petition requirements *post*-election,[33] it has not recently sanctioned application of substantial compliance to nonconforming petitions before an election. The only Michigan Supreme Court case to apply the substantial compliance doctrine pre-election is *Kadans v Wayne County Clerk*.[34] In that case, the plaintiff sought a writ of mandamus compelling the defendant to certify his nonconforming nominating petitions. Fifty-eight of the plaintiff's fifty-nine petitions were not 8½ by 13 inches as required by former MCL 168.544, but were 2½ to 3 inches shorter than 13 inches because they were missing the circulator's affidavit. This Court unanimously found that former MCL 168.544 had "been complied with by plaintiff according to the rule of 'substantial compliance'" and that the plaintiff was entitled to the writ of mandamus.[35]

---

[33] It has long been held that post-election challenges substantially relax technical requirements on the grounds that any technical deficiencies are cured by the voters' affirmative approval of the underlying proposal. See *Carmen v Secretary of State*, 384 Mich 443, 454-455; 185 NW2d 1 (1971) (reasoning that the error in noncompliant initiatory petitions was cured by voters' adoption of the constitutional amendment because they were "directly notified" of the omitted information on election day); *City of Jackson v Commissioner of Revenue*, 316 Mich 694, 716-718; 26 NW2d 569 (1947) (noting that courts should view technical errors differently once the electors have voted affirmatively).

[34] *Kadans v Wayne Co Clerk*, 363 Mich 306; 109 NW2d 788 (1961).

[35] *Id*. at 308.

*Kadans*'s broad application of the substantial compliance standard, however, was repudiated by the Legislature's subsequent adoption of MCL 168.544d.[36]    Before adoption of that provision, the law was silent with respect to agency-created or agency-prescribed petitions.   The adoption of MCL 168.544d now provides clear guidance concerning when substantial compliance is allowed with regard to agency-created or agency-prescribed petitions and essentially delegates to the Secretary of State the ability (through its prescribed petitions) to determine what requirements must be fully complied with and what requirements need be only substantially complied with.   Consequently, the only case from this Court applying a general substantial compliance exception to mandatory petition requirements of the Michigan Election Law has been superseded by statute.

In sum, neither the statutory scheme nor the caselaw plaintiff relies on supports application of the substantial compliance doctrine in the period before an election. Rather, for substantial compliance to be sufficient before an election, its use must be rooted in a particular statutory exception to the statutory formatting and content requirements.   Because no statutory provision permitting application of substantial compliance exists in the instant case, and because intervenor has raised a pre-election challenge, plaintiff must have actually complied with the requirements of MCL 168.482(2) in order for its referendum petition to be certified.[37]

---

[36] 1975 PA 327.

[37] The partial dissent of Justices CAVANAGH, MARILYN KELLY, and HATHAWAY asserts that "there are four votes that find at least substantial compliance . . . ." *Post* at 3.  This assertion is simply untrue.  Rather, there are four votes for the elimination of the judicial expansion of the substantial compliance doctrine, and the partial dissent has refused to

16

## B. ACTUAL COMPLIANCE

## 1. TYPE-SIZE REQUIREMENT OF MCL 168.482(2)

To determine whether plaintiff has actually complied with MCL 168.482(2), we must first determine the meaning of the phrase "printed in capital letters in 14-point boldfaced type[.]" The Michigan Election Law does not define the terms "point" and "type," but the parties agree that the traditional definitions of "point" and "type" have not substantially changed since the enactment of the statute in 1954. We agree with the traditional definitions proposed because they are consistent with those terms' acquired technical meanings[38] and those definitions have remained constant up to the present day. "Point" is defined as "a unit that is used to measure the size of type used in printing and that is equivalent to about 1/72 inch[.]"[39] "Type" is defined as "[a] rectangular block,

---

recognize that we have now eliminated this judicially created doctrine. Accordingly, when a petition is challenged pre-election, the petition must actually comply with the statutory mandates of MCL 168.482(2), or the petition must substantially comply pursuant to a specific statutory exception or through a form prescribed by the Secretary of State. Neither of the latter two circumstances exists in this case.

[38] MCL 8.3a.

[39] *Webster's Third New International Dictionary of the English Language, Unabridged Edition* (1965), p 1750. The definition of "point system" before the enactment of the statute refers to substantially the same unit of measurement used to measure type. See *Webster's New International Dictionary of the English Language, Second Edition Unabridged* (1948), p 1904 ("A system according to which the various sizes of type bodies, leads, etc., bear a fixed and simple relation to one another. The point system now in general use in America was adopted in 1886 by the United States Type Founders' Association, though many founders were already using it. It is a modification of a French system, and is based upon the pica body then most used. This body is divided into twelfths, called "points," and every type body consists of a given number of these points; as, the body of this book is printed in 6-*point*. The value of the point is .013837 inch, or nearly 1/72 inch. For specimens of sizes, see TYPE.").

usually of metal or wood, having its face so shaped as to produce, in printing, a letter, figure, or other character[.]"[40]   Multiple dictionary depictions of type show that the character, or typeface, does not cover the entire surface of the type, but rather includes spacing above or below the letters, to prevent the printed characters from touching.[41] These depictions further demonstrate that the point size of type measures the entire vertical face of the metal block.  The significance of these definitions is that the character printed is smaller than the point size of the type.[42]

---

[40] *Webster's New International Dictionary of the English Language, Second Edition Unabridged* (1948), p 2750.  "Type" is also defined as "Such blocks, or the letters or characters impressed, collectively."  *Id.*   Notably, Justice MARKMAN prefers this definition, but he does not faithfully adhere to it because he omits the definition's reference to "blocks."  Further, despite the parties' agreement regarding the technical meanings of these terms, Justice MARKMAN nonetheless asserts that because other methods of printing were available in 1954, that it is more reasonable to interpret "type" as the text or type produced.  We reject Justice MARKMAN's preferred definition of "type" based on the availability of other printing methods for the well-explained reasons articulated by Chief Justice YOUNG.  These other printing methods are simply irrelevant because to ascertain the Legislature's intent we must focus on the language used, not extraneous then-available printing methods.  Indeed, the meanings of "point" and "type" were well-established in 1954, and had the Legislature intended some other unit of measurement to take account of these other printing methods, the Legislature could have said so, but it did not.

[41]  See *Webster's Third New International Dictionary of the English Language, Unabridged Edition* (1965), p 2476 (diagram of "type"); *Webster's New International Dictionary of the English Language, Second Edition Unabridged* (1948), p 2750 (diagram of "type").

[42] Furthermore, the definition of "point" refers to "type used in printing," *Webster's Third New International Dictionary of the English Language, Unabridged Edition* (1965), p 1750, and the definition of "point system" refers to the "sizes of type bodies," *Webster's New International Dictionary of the English Language, Second Edition Unabridged* (1948), p 1904.  These references to "type" within the definition of "point" further support the conclusion that, whether the "type" refers to the printer's blocks themselves, or whether it refers to the alternative definition of the resulting printed letters, the point

18

The parties' views diverge, however, with respect to whether the phrase "printed in capital letters in 14-point boldfaced type" requires measurement of the "letters" or of the "type." Intervenor, like the Court of Appeals, interprets the phrase to require that the "letters" measure 14 points. We disagree with this interpretation and conclude that the *type* must measure 14 points, not the resulting printed letters. This is because the technical definition of "point" specifically denotes that point measures type size, which is the entire vertical length of the printer's block. As explained, the technical meanings of "point" and "type" necessarily incorporate some amount of blank space so that the capital letters in 14-point type do not necessarily measure 14/72 of an inch.

Intervenor claims that because "in" means "made of," the letters must measure 14 points. However, this argument is specious. The term "14-point" specifically modifies the word "type," and there is no indication that the Legislature intended to diverge from the technical meanings of the terms "point" and "type." Had the Legislature intended that the physical height of the letters measure 14 points, it would not have used the term "type" as modified by "14-point" and instead could have specified that the letters must "measure 14 points."[43]

---

measurement of type exists by reference to the actual printer's blocks, contrary to Justice MARKMAN's claim.

[43] Having considered this textual argument, which is substantially the same as that offered by Justice MARKMAN, his contention that we have not considered this language is clearly incorrect. Rather, it is Justice MARKMAN that has failed to consider the phrase, "printed in capital letters in 14-point boldfaced type," in the context of the entire section as we explain in footnote 44 of this opinion.

19

Furthermore, intervenor's argument does not take into account the remaining subsections within MCL 168.482, which provide additional support for our conclusion. Subsection (3) states, "The full text of the amendment so proposed shall follow and be printed in 8-point type," while subsection (5) states, "The following warning shall be printed in 12-point type . . . ." Reading these subsections together with subsection (2), and consistently as a whole as we must,[44] it is clear that the point size of all the required text refers to the size of the type and not the individual letters. The fact that the other content requirements are not required to be in capital letters, but a combination of uppercase and lowercase letters, necessarily contemplates that letters in the required type size may have different heights, since a lowercase "x" has a different height than an uppercase "E." This provides further support for the conclusion that the "type," and not each individual "letter," must be measured. Otherwise, if intervenor's position were adopted, each of the letters in subsections (3) and (5) would have to be of equal physical size, contrary to the Legislature's clear indication in subsections (3) and (5) that the

---

[44] "[W]ords and phrases used in an act should be read in context with the entire act and assigned such meanings as to harmonize with the act as a whole." *People v Couzens*, 480 Mich 240, 249; 747 NW2d 849 (2008) (quotation marks and citation omitted). Yet, Justice MARKMAN, like intervenor, reads MCL 168.482(2) in isolation to conclude that "type" must refer to the point size of the letters. Were we to adopt intervenor's and Justice MARKMAN's position, we would essentially adopt two different definitions of type, requiring petitioners to measure the letters under MCL 168.482(2), but measure the type under MCL 168.482(3) and (5). Indeed, Justice MARKMAN does not explain how to reconcile the language of MCL 168.483(2) with that used in subsections (3) and (5). Instead, he posits that the language of MCL 168.482(2), specifically the terms "printed" and "letters," and "in" instead of "with," evince a clear intent that the letters measure 14 points and not the type. This view is unpersuasive for reasons I, and Chief Justice YOUNG, have explained in detail.

20

required text appear in both uppercase and lowercase letters. Given the foregoing, it is clear that the reference to "letters" in MCL 168.482(2) is intended merely to clarify that the text of the heading appear in all capital letters.[45] We would therefore hold that MCL 168.482(2), by its plain terms, requires that the *type* of the petition heading measure 14 points, not the individual letters.

## 2. MEASUREMENT OF DIGITAL TYPE

Having concluded that the "type" of the petition heading and not the letters must measure 14-points, does not end the analysis. Rather, it must be determined whether plaintiff's petition heading measures 14-point type. This question necessarily involves the preliminary issues whether the traditional meanings of "point" and "type" are transferrable to digital text and, if so, how digital 14-point type is to be measured.

While plaintiff and intervenor disagree on these points, the assistant attorneys general representing the Board of State Canvassers and the Secretary of State conceded at oral argument and in their supplemental brief concerning intervenor's application for leave to appeal in this Court, that those "same [traditional] concepts [of point and type] are replicated in computer software programs that result in the production of digital type

---

[45] We disagree with intervenor's and Justice MARKMAN's suggestion that the letter must be measured because otherwise, an illegible 3-point letter in 14-point type would comply with the statute. Intervenor, like Justice MARKMAN, thus asserts that measurement of the type would defeat the purpose of MCL 168.482(2). This situation is not before this Court. Moreover, simply because the size of letters could be manipulated within a 14-point-type setting does not mean that the Legislature intended that the heading's letters each measure 14 points.

21

from an electronic printer."[46]  Counsel for the board and the Secretary of State has also

conceded that the same methods of measurement applicable to metal blocks of type are

applicable to digital type.[47]  Further, because this Court can take judicial notice of facts

not subject to reasonable dispute,[48] I acknowledge that Microsoft's glossary of

typographical terms defines "point" consistently with that term's traditional meaning, as

"[a] unit of measurement, often used to measure type size, equal to 0.013837 inch

(approximately equal to 1/72 . . .)."[49]  And although Microsoft's glossary does not

---

[46] At oral argument, the assistant attorney general representing the board and the Secretary of State stated, "Essentially software of the digital era is intended to replicate what was done in the past."

Further, although this Court construes the statutory language "in the light of the circumstances existing at the date of [the statute's] enactment, not in the light of subsequent developments" *Wayne Co Bd of Rd Comm'rs v Wayne Co Clerk*, 293 Mich 229, 235-236; 291 NW 897 (1940), I view the Legislature's decision not to amend these technical terms, despite several amendments in the digital age, see 1993 PA 137 and 1998 PA 142, as an acknowledgement that the meaning of those terms has carried over to computerized printing.

[47] With regard to the measurement of type, the assistant attorney general at oral argument answered, "That is my understanding," in response to Chief Justice YOUNG's inquiry, whether "[e]ven though we now have a different method of producing type, has that measurement [from the traditional printing industry] been faithfully transcribed to digitized production?"  Curiously, neither Chief Justice YOUNG nor Justice MARKMAN attach any significance to defendants' concessions, despite the fact that the Board of State Canvassers and the Secretary of State are charged with implementing Michigan's election laws, including the approval or denial of referendum petitions and are, thus, in the best position to provide expertise regarding the proper measurement of digital text.

[48] *People v Goecke*, 457 Mich 442, 448 n 2; 579 NW2d 868 (1998) (noting that this Court may take judicial notice of facts not subject to reasonable dispute); MRE 201.

[49] Microsoft Support, *WD2000: Definitions of Typography Terms in Word* <http://support.microsoft.com/kb/192973/en-us> (accessed August 1, 2012).

22

include the definition of "type," it defines "font size" as the "size of type . . . ."[50]  A

separate Microsoft webpage further indicates that, when measuring the point size of type,

the letter does not cover the entire "block" because "a little bit [is] added on . . . so that

lines of type 'set solid' (without any additional space between them) do not bash into

each other."[51]

---

[50] *Id*.  Chief Justice YOUNG asserts that judicial notice cannot be taken of how Microsoft "programmed its font system . . . ."  *Post* at 12 n 13.  Yet, I have not taken judicial notice of such facts and have only taken judicial notice of terms specifically defined by Microsoft.  That Microsoft has adopted certain definitions of "point," and "font size," and acknowledged that the point size of "type" measures not the letter but the digital block, is hardly subject to dispute.  I fail to see how my acknowledgment of Microsoft's definitions of these terms, made known to the public, is any different from this Court's decisions to take judicial notice of economic conditions, *In re Baldwin's Estate*, 311 Mich 288, 312; 18 NW2d 827 (1945), common human behaviors, *Moore v Capital Nat'l Bank of Lansing*, 274 Mich 56, 66-67; 264 NW 288 (1936), or an agency's decision to change an historical practice, *Grandville Muni Executive Ass'n v City of Grandville*, 453 Mich 428, 442; 553 NW2d 917 (1996), or, indeed, this Court's common practice of relying on dictionary definitions when interpreting a statute.

Justice MARKMAN also attempts to discredit my use of judicial notice, asserting that I have assumed that Microsoft defines type as font size.  His assertion that there is "no evidence" to reach this conclusion, *post* at 13, is unfounded because, as I explain, Microsoft has specifically acknowledged that the size of type incorporates additional space not covered by the font, or actual letter.

[51]  Microsoft, *The Relationship Between Font Size and Physical Type Size* <http://www.microsoft.com/typography/web/designer/face3.htm> (accessed August 1, 2012).  Consistently with Microsoft's recognition that digitized type is larger than the actual character, other modern typographical sources recognize that computer characters are contained within an invisible box, or blocking around the letter, which replicates the metal block used in mechanical typesetting.  See Ambrose & Harris, *The Fundamentals of Typography* (Lausanne: AVA Publishing SA, 2d ed, 2011), p 46; Bringhurst, *The Elements of Typographic Style* (Vancouver: Hartley & Marks, 1992), p 289.  Notably, just like the characters on physical type, the digital characters within digital type will take up different amounts of space within the type depending on the font family.  See Craig, Scala, & Bevington, *Designing with Type: The Essential Guide to Typography* (New York: Watson-Guptill Publications, 5th ed, 2006), pp 17-18.  This is why different fonts

Given the concessions made by counsel for the board and the Secretary of State and Microsoft's definitions of point and type, it is clear that digital type is the equivalent of physical type and that computer software continues to use this basic terminology.[52] Further, because digital type and physical type are functional equivalents, they are measured in the same manner except in the instance of digital type; in that instance an invisible box, which replicates the printer's block, is measured and is reflected by the font size selected.[53]

## 3.  APPLICATION

In the present case, plaintiff used 14-point Calibri font for its petition heading, as attested to by plaintiff's printer.  Although plaintiff's printer's affidavit did not state the basis for this conclusion, the affiant explained at the Board of State Canvassers hearing how he verified the point size:

> When I was asked to sign the affidavit, I took the file that we were given, that we had assembled for printing purposes, and I used a program . . . called PDF Suite.  And I went in and I verified that it was 14-point . . . .

of different point, or font size, appear smaller or larger in comparison to one another. This is yet another reason why measurement of the digital letter will yield an inaccurate type size.

[52] Aside from the concessions and Microsoft's definitions, multiple modern typographical sources also support this conclusion.  Ambrose, *The Fundamentals of Typography*, p 46; Craig, *Designing with Type*, pp 17-18.

[53] This conclusion is implicit in Microsoft's adoption of the technical term "point" and its acknowledgment that digital type is the equivalent of metal type.  Adobe also acknowledges that measurement for metal type is used for the measurement of digital type.  Adobe, *Measuring Type* <http://www.adobe.com/type/topics/info2.html> (accessed August 1, 2012).

Intervenor filed two competing affidavits, but did not present any expert testimony at the hearing. Both affiants measured the size of the petition heading's capital letters and each concluded that the heading is in "a significantly smaller font than required" without providing a basis for this conclusion. I do not view these affidavits as dispositive because, as I have already concluded, measuring the letters to determine compliance with MCL 168.482(2) is an inappropriate method of measurement.

I also do not view as dispositive the intervenor's supplemental affidavit submitted after we granted oral argument on the application.[54] In this affidavit, the affiant attested that, using an E-scale ruler,[55] the type of the petition heading did not measure 14 points, and that while the E-scale ruler "subtract[s] the space above or below the actual letter," the E-scale ruler only reflects how characters of a particular font in 14-point type will appear. Because different fonts take up different amounts of space within the digital block, an E-scale ruler cannot definitively measure whether the actual font selected is in 14-point type.

I also find the affiant's comparison of plaintiff's heading with 14-point type metal blocks that were available in 1954 to be unpersuasive. The affiant avers that this comparison shows that plaintiff's heading is "clearly a smaller type size," yet the spacing between the lines of text in each of the three examples appears to be the same. This

---

[54] After intervenor moved for leave to appeal and we granted argument on the application, this Court granted intervenor's motion to supplement the record. *Stand Up For Democracy v Secretary of State*, 492 Mich ___ (2012).

[55] An E-scale ruler reprints various letters "E" of the same font family that comprise different type sizes to provide a side-by-side comparison between the example type size and the printed letter.

25

exercise only demonstrates what we already know: Different styles of font will take up different amounts of space on a printer's metal or digital block. In fact, plaintiff's expert testified with regard to this very fact at the hearing:

> Basically when you're talking about 14-point type, you're talking about an area that's just less than a fifth of an inch, .194. And it becomes a canvas that a type designer gets to work with, and sometimes they use the whole canvas and sometimes they use part of the canvas.

Consequently, the affiant's comparison does not establish that plaintiff's heading is noncompliant. Rather, because the spacing between the lines of each example of text appears to be equal, the comparison tends to demonstrate actual compliance with the 14-point-type requirement.

My review of intervenor's evidence shows that intervenor failed to establish that plaintiff's petition's heading was not in 14-point type and otherwise failed to create a legitimate question of fact regarding the type size used. Plaintiff's evidence established that its printer used a 14-point Calibri font, which the printer verified using Adobe software, and which intervenor simply failed to rebut. Because Microsoft defines font size to equal type size, plaintiff presented evidence establishing that it actually complied with the type-size requirement of MCL 168.482(2). There being no evidence to the contrary, I conclude that plaintiff actually complied with MCL 168.482(2).

## C. MANDAMUS

We must next determine whether plaintiff is entitled to a writ of mandamus requiring certification of the referendum petition. Mandamus is an extraordinary remedy

26

and the primary purpose of a writ of mandamus is to enforce duties required by law.[56] To obtain a writ of mandamus the plaintiff must show that it has a clear legal right to the performance of the specific duty sought to be compelled and that the defendant has a clear legal duty to perform the act.[57]

The board's duty with respect to referendum petitions is limited to determining the sufficiency of a petition's form and content and whether there are sufficient signatures to warrant certification.[58] In this case, there is no question that plaintiff collected more than enough valid signatures in support of its petition. However, because the board deadlocked on the issue of compliance with the type-size requirement of MCL 168.482(2), the board did not certify the petition. Because plaintiff's petition actually complied with the type-size requirements of MCL 168.482(2), the board is obligated to certify the petition. Accordingly, I conclude that plaintiff is entitled to a writ of mandamus because the board has a clear legal duty to certify the petition as actually compliant with MCL 168.482(2).

## IV. CONCLUSION

A majority of this Court holds that the doctrine of substantial compliance is inapplicable to referendum petitions submitted for pre-election certification and we overrule *Bloomfield Twp*. I and two other justices further conclude that the type-size

---

[56] *State Bd of Ed v Houghton Lake Community Sch*, 430 Mich 658, 666-667; 425 NW2d 80 (1988).

[57] *In re MCI Telecom Complaint*, 460 Mich 396, 442-443; 596 NW2d 164 (1999).

[58] See MCL 168.476 and MCL 168.477.

27

requirement of MCL 168.482(2) requires that the "type," not the "letters," of the petition heading measure 14 points. I additionally conclude that plaintiff actually complied with the type-size requirement. Finally, a majority of this Court holds that plaintiff is entitled to a new writ of mandamus requiring the Board of State Canvassers to certify its petition as sufficient. Accordingly, a majority of this Court directs the Board of State Canvassers to certify plaintiff's petition for the ballot and, pursuant to MCR 7.317(C)(3), we direct the Clerk of the Court to issue the judgment order forthwith.

## SUMMARY

(1) A majority of this Court holds that the Court of Appeals erred by granting mandamus on the basis of plaintiff's substantial compliance with election law. The Court of Appeals opinion and grant of mandamus are reversed. Substantial compliance with the requirements of MCL 168.482(2) is insufficient to establish that plaintiff's referendum petition is entitled to be placed on the ballot. Entitlement to be placed on the ballot requires a showing of actual compliance with the law.

(2) The Board of State Canvassers shall certify the petition as sufficient because a majority of the Court concludes that plaintiff either actually complied with the law or that the Court of Appeals' original writ of mandamus was not erroneous. Accordingly, a new writ of mandamus shall enter.

Mary Beth Kelly

28

STATE OF MICHIGAN

SUPREME COURT

STAND UP FOR DEMOCRACY,

        Plaintiff-Appellee,

v                                       No. 145387

SECRETARY OF STATE and BOARD OF
STATE CANVASSERS,

        Defendants,

and

CITIZENS FOR FISCAL
RESPONSIBILITY,

        Intervenor-Defendant-
        Appellant.

_____

YOUNG, C.J. (*concurring in part and dissenting in part*).

We concur with and join parts I, II, III(A), and III(B)(1) of Justice MARY BETH KELLY's opinion. We agree with Justices MARY BETH KELLY and MARKMAN that *actual compliance* with the statutory type requirements is mandated. In determining how to measure the type size, we believe that the technical (namely, the customary printer's) understanding of the statutory terms "type" and "point" negate the intervernor's notion that one can determine the size of "type" by measuring the characters actually printed. Consequently, the question we must resolve is whether the "size 14" Calibri font generated by plaintiff's computer is a faithful replication of the statutorily required

heading in 14-point type that would have been generated by using traditional movable type.

On this question, Justice MARY BETH KELLY believes that it is possible on this record, and with reference to extrarecord materials, both to determine how a digitized computer font is produced and that the font at issue here meets the statutory size requirement. She does so by invoking judicial notice. We do not share Justice MARY BETH KELLY's technical literacy: we lack the necessary knowledge of printing and, more important, the programming necessary to create computer fonts. Therefore, we respectfully dissent from her conclusion that plaintiff actually complied with the type size requirements in MCL 168.482(2).

As a result, we conclude that plaintiff failed to establish that its petition heading met the statutory type and print requirements. Because of this failure of proofs, we would deny plaintiff's claim for mandamus, thus reversing the Court of Appeals' decision on the merits. However, given the stunning transformation of the printing industry since the statutory requirements were enacted—from movable type to computer generated print—and because we believe that the historical statutory terms are nonetheless applicable in this new computer era, it is important for this Court to establish a precedent to guide future petition efforts. While we reject her conclusion that actual compliance has been proved here, we believe that Justice MARY BETH KELLY's opinion has provided this guidance on the controlling legal principles.

Important to our resolution of this case, however, is the fact that the legal standards under which the Secretary of State, the Board of State Canvassers, and the parties operated were confused and, as held today, erroneous. As a consequence, we

2

would allow plaintiff an opportunity to present proofs to the Board of State Canvassers under the announced correct legal standards. Accordingly, we would remand this case to the Board of State Canvassers for further proceedings to determine whether plaintiff's petition heading actually complied with the type size requirements of MCL 168.482(2).

As eloquently stated by Justice MARY BETH KELLY, this appeal concerns a big constitutional issue about an apparently small thing: the size of a heading required for circulated petitions like the one at issue here. And although a "technical" requirement—the size of a petition heading—is involved, this is a legally and constitutionally significant matter because compliance with the legal petition requirements is the only means by which a small fraction of Michigan citizens is permitted to countermand the will of the people as expressed through the legislation duly enacted by their elected representatives.

So this case about a "technicality" is *not* about the wisdom of the act the plaintiff's petition seeks to suspend, nor is it about "the people's right to vote," as plaintiff characterizes the issue. The fact is, the people *have voted*: they elected the very Legislature and Governor who enacted the emergency financial manager act, PA 4, MCL 141.1501 *et seq*., that plaintiff challenges with its petition.

*The sole question before us* is whether plaintiff has filed a *qualifying*, legally compliant petition that permits it to both suspend this validly enacted law and require its members' fellow citizens to determine whether this law will remain on the books. As Justice MARY BETH KELLY explains, this is a core issue in a *constitutional republic* like ours.

3

I.  ANALYSIS

A.  THE JUDGE-MADE "SUBSTANTIAL COMPLIANCE" DOCTRINE, TO THE EXTENT THAT IT REMAINS VIABLE, IS SUPERSEDED HERE BY THE LEGISLATIVELY DEFINED SUBSTANTIAL COMPLIANCE PROVISION OF MCL 168.544d.

MCL 168.482(2) requires that the petition heading "shall be . . . printed in capital letters in 14-point boldfaced type[.]"  A majority of the Court agrees that, for the reasons that Justice MARY BETH KELLY's and Justice MARKMAN's separate opinions explain, the judge-made doctrine of substantial compliance is insufficient to entitle plaintiff to certification of its petition.  Because MCL 168.482(2) uses the mandatory language "shall" regarding the type size of the petition heading, plaintiff must fully adhere to this provision unless another statutory provision specifically allows for substantial compliance.  As Justices MARY BETH KELLY and MARKMAN correctly explain, there is no statutory provision that would allow the Board of State Canvassers to apply the doctrine of substantial compliance to plaintiff's petition in this case.  In particular, MCL 168.544d incorporates a substantial compliance provision specifying that only the Secretary of State *may* prescribe forms that substantially comply with the statutory requirements for petitions.

In this case, the Secretary of State actually mandated compliance with the required statutory conditions,[1] and plaintiff cannot prevail on the ground that it "substantially

---

[1] The Secretary of State, in its advisory designed to provide guidance to citizens engaged in the petition process, cited MCL 168.482(2) and explained that the heading "shall be printed in capital letters in 14-point boldface type on the left margin of the signature side of the sheet or at the top of the signature side of the sheet."  Secretary of State memorandum, Initiative and Referendum Petitions – Prescribed Format (revised June 2011).  Of course, the Secretary of State has the authority to determine that "size 14,"

4

complied" with the 14-point type requirement. Thus, unless plaintiff *actually* complied, there is no clear legal right to have its petition certified.

### B. THE MANDATORY STATUTORY "POINT" SIZE REQUIREMENTS FOR "TYPE" REFER TO THE SIZE OF A TRADITIONAL MOVABLE *TYPE BLOCK*, NOT THE SIZE OF THE ACTUAL PRINTED CHARACTER ON THE PETITION.

We agree with Justice MARY BETH KELLY that the Court of Appeals panel erred to the extent that it concluded that the petition heading's *printed letters* themselves must measure 14 points in height. While the Court of Appeals panel correctly recognized that a point is a unit of measurement (approximating 1/72 of an inch), the definitions of "point" and "type" that predominated at the time the Legislature enacted MCL 168.482 belie the conclusion that the printed letters themselves must measure 14 points in height.

The Legislature enacted MCL 168.482 in 1954 and amended it in 1965 to provide that the heading "shall be . . . printed in capital letters in 14-point bold face type[.]"[2] In determining the meanings of "point" and "type," this Court must accord these terms their "peculiar and appropriate meaning[s]" at the time of enactment.[3]

*Webster's New International Dictionary of the English Language, Second Edition Unabridged* (1948) defines "type" as "[a] rectangular block, usually of metal or wood,

---

"size 12," or "size 8" computer fonts comply with the statutory type size requirements of MCL 168.482(2), (5), and (3), respectively.

[2] 1954 PA 116; 1965 PA 312. 1993 PA 137 amended MCL 168.482 to divide it into subsections and substitute "boldface" for "bold face," while 1998 PA 142 substituted "boldfaced" for "boldface." Neither of these subsequent amendments altered the terms "point" or "type."

[3] MCL 8.3a.

5

having its face so shaped as to produce, in printing, a letter, figure, or other character" or, alternatively, as "[s]uch blocks, or the letters or characters impressed, collectively."[4]  It defines "point system" specifically in relation to the blocks themselves: "A system according to which the various sizes of type bodies, leads, etc., bear a fixed and simple relation to one another. . . .  The value of the point is .013837 inch, or nearly 1/72 inch."[5]

---

[4] *Webster's New International Dictionary of the English Language, Second Edition Unabridged* (1948), def 17, p 2750.  Similarly, *Webster's Third New International Dictionary of the English Language (Unabridged)* defines "type" as "a usu[ally] metal, wood, or plastic rectangular block having on its face a relief character of which an inked impression will produce a printed character" or, alternatively, as "a printed impression from type[.]"  *Webster's Third New International Dictionary of the English Language (Unabridged)* (1966), defs 3a and 3f, p 2476.

[5] *Webster's New International Dictionary of the English Language, Second Edition Unabridged* (1948), def 3, p 1904.

Importantly, the dictionary contains a diagram of type that shows that the *type face*, or raised portion of the type block that actually imprints the ink onto the paper, is somewhat smaller than the size of the type block itself.  The following diagram of a type block, taken from a 1963 treatise on typography, similarly shows how the *type face* does not extend to the entire space of the printer's block.  Moreover, it shows that the *point body* of the type is measured by reference to the entire printer's block.[6]



This is consistent with the print literature dating back to the turn of the last century.  An early twentieth century technical treatise on type explains:

> Only a few letters, like J and Q, cover nearly the entire surface on the end of the type; other letters, like B h l i, cover the upper portion chiefly and leave a blank space at the bottom; while the small letters, like a e o u v, occupy only the middle portion of the surface; still others, like g y p, cover the middle and lower portions of the surface.  As all these irregular shapes

---

[6] Rosen, *Type and Typography* (New York: Reinhold Publishing Corp, 1963), p 16, available at <http://babel.hathitrust.org/cgi/pt?id=mdp.39015047342434> (accessed August 2, 2012).

must be made to appear in line with each other, the type-body on which they are made is larger than the letter.[7]

Moreover, *Webster's Third New International Dictionary of the English Language (Unabridged)* defines "point" by referring to an illustration of "type" that refers to the block's "point size" as the entire length of the block, not just the raised portion that creates the printed character.

In short, there does not appear to be any dispute about the historical understanding of these technical printer's terms.[8]  These dictionary definitions and technical sources

---

[7] Stewart, *Type* (Chicago: United Typothetae of America, 1918), pp 7-8.

[8] Justice MARKMAN argues that printers employed other methods of printing in 1954, when this statute was first enacted, and some of these methods did not use movable type. This is certainly a true statement, but it does not gainsay that the terms "point" and "type" were rooted in the movable type process and have well-known fixed meanings as we have explained.

Thus, Justice MARKMAN's examples of other alternative printing methods that did not require movable metal type blocks misses the point.  Even if one of the rivals to letterpress printing methods were entirely divorced from the use of movable type, had it been used in a petition and challenged on the ground that it did not comply with the 14-point requirement, the same legal question raised here would have been presented: Did the alternative printing method satisfy the 14-point requirement as points were commonly understood in the printing industry?

Justice MARKMAN may find it hard to understand why the Legislature chose an indirect method of specifying the size of various print in petitions, but that is exactly what it did.  And it did so by using technical terms of art in the printing field that have a longstanding and undisputed meaning.  Justice MARKMAN chooses to rely on some of those definitional meanings, such as the fact that a "point" measures 1/72 of an inch. However, he jettisons others (the fact that point size is measured by the printer block, not the size of the character that rests on top) to advance his "direct measure" theory that one must measure the actual printed letters.  Justice MARKMAN is free to question the wisdom of this legislative choice, but he may not ignore it, nor may he pick and choose among the established technical definitions of the statutory terms.

show unequivocally that, "although the body size of metal type is consistent, the printed letters themselves vary in size. Since no individual letter fills the entire body, you can see why merely measuring the printed letter will not reveal the point size."[9] Moreover,

[9] Craig, Scala & Bevington, *Designing with Type* (New York: Watson-Guptill Publications, 5th ed, 2006), p 17.

*One thing is clear: the Legislature mandated that the petition type used be of a certain point size, but it did not mandate that a particular style of printed character be used.* And therein lies the problem. It appears that printed characters of a particular style can be larger or smaller than other styles in the same point size.

Today, a modern Legislature might mandate the size of petition printing by reference to "fonts" rather than "points." And as the record in this case demonstrates, even fonts listed as being of the same size appear to be larger and smaller than one another depending on the style of font selected. Accordingly, a "direct measure" approach to sizing the printed characters such fonts produce would be no more productive than it is in measuring points.

Justice MARKMAN nevertheless concludes that the statutory reference to 14-point type means that the actual printed character set must measure 14/72 of an inch high when measured from the top of the ascender of a lowercase letter (such as "h") to the bottom of the descender of a lowercase letter (such as "j"). He asks, how could the Legislature have made plainer this intention than by mandating "14-point boldfaced type"?

The Legislature used a commonly understood term, "point," which was and is understood to refer not to the size of the character printed but the block on which the character that produces the printed image sat. Thus, even though "type" can refer to the printed characters produced from a block of movable type, the *point measurement* of "type" exists by reference to the underlying block of type, not to the printed "type." The provenance of this definition is unchallenged. The Legislature need not have known precisely how printers designed type in order to have understood the general orders of size in typography and that 14-point type was larger than 12-point or 8-point type. It used each of these sizes in the petition requirements. Those who frequently used printed materials generated with traditional printing methods in 1954—which would have included legislators, given that the Legislature had its own printing press—would have certainly understood the general notion of point sizing, in much the same way that most adults today are familiar with computer fonts, even if they know nothing about how those fonts were created.

because different type style families (now colloquially referred to as "fonts") use the available space differently, "[d]ifferent typefaces having the same point size may appear larger or smaller . . . ."[10]  Therefore, plaintiff's expert correctly explained at the hearing before the Board of State Canvassers that the space on the top of a printer's block "'becomes a canvas that a type designer gets to work with, and sometimes they use the

---

The intervenor posits the claim that each individual letter must measure 14/72 of an inch.  However, if the Legislature wanted more directly to mandate the size of the actual printed characters, it could easily have stated that "the letters of the petition heading shall be 'X' tall" or, if it wanted to use printer's jargon, "the letters of the petition shall be 14 points in height."  It did neither, presumably in reliance on the printing traditions then extant.  Moreover, this argument founders when considering the whole of MCL 168.482.  Subsections (3) and (5) both contain type size requirements.  However, unlike subsection (2), they contemplate that the required text may appear in both capital and lowercase letters, which by definition have varying physical sizes.  Nevertheless, the Legislature chose to use in subsections (3) and (5) the same terms— "point" and "type"—that it used in subsection (2).

[10] Craig, *Designing with Type*, p 18.  Thus, an E-scale ruler provides only an approximation of type size and not an exact measurement of type size.  This is because an E-scale ruler only contains an example of *one particular type style family* among the multitude of various styles of type in use.  To the extent that other type style families measure slightly differently than the E-scale's example, the resulting E-scale measurement will not provide a precise determination of the type size shown.

Thus, contrary to the alternative method of measurement that the intervenor and Justice MARKMAN urge be used for determining type size by directly measuring the printed characters, the Board of State Canvassers cannot measure the type size of the petition heading simply by comparing the letters on the petition heading to a 14-point capital "E."  Indeed, the most compelling evidence in the record that the E-scale ruler provides only approximate sizing of type is the affidavit of the intervenor's own expert, who indicated that one of the example headings that had been printed using 14-point metal type measured "slightly larger" than the 14-point capital "E" on an E-scale ruler.  Moreover, the existence of variation between different type style families undermines Justice MARKMAN's claim that application of the "printer's block" approach would not warrant a remand in this case.

whole canvas and sometimes they use part of the canvas.'"[11]  Because type size incorporates some amount of additional space on the printer's block, and because different type style families use that space differently, different sized letters result even when printed from blocks of the same size.

C.  WHEN A PETITION IS PRINTED USING COMPUTER GENERATED FONTS, IN ORDER TO ESTABLISH COMPLIANCE WITH THE STATUTORY TYPE SIZE REQUIREMENT, THE PETITION'S PROPONENT MUST SHOW THAT THE FONT USED FAITHFULLY REPLICATES WHAT A TRADITIONAL TYPE BLOCK WOULD HAVE GENERATED.

While these definitions of "point" and "type" are clear based on their customary technical meanings, the confounding issue in this case is how to apply these historical definitions in an age when digital printing predominates.  Contrary to Justice MARY BETH KELLY's conclusion, we do not believe that the evidence available to us is sufficiently clear for this Court to take judicial notice that Microsoft's digital fonts replicate the point measure that the Legislature intended.  Because digital fonts do not use physical printer's blocks, it is not self-evident that the system of digital fonts accurately replicates the movable type point system.[12]  Plaintiff's Calibri heading may well actually comply with the statutory 14-point type requirement.  However, simply choosing a digital "size 14"

_____

[11] *Stand Up For Democracy v Bd of State Canvassers*, ___ Mich App ___, ___; ___ NW2d ___ (2012) issued June 8, 2012 (Docket No. 310047), slip op at 6.

[12] Justice MARKMAN's detailed critique of Justice MARY BETH KELLY's resort to inconclusive materials outside the record reinforces our belief that this Court has no competency to make the kind of factual determination that was never addressed and certainly not provided in the record.

11

font does not prove that it is equivalent to the 14-point type standard that the Legislature required when it enacted MCL 168.482.

In light of the fact that no one understood when the Board of State Canvassers held the hearing that plaintiff was obligated to establish this equivalency, it is not hard to understand why its proofs consisted of little more than an attestation that its printer faithfully selected "size 14" Calibri font on his computer. Similarly, this is the reason why Justice MARY BETH KELLY must look outside the record and employ "judicial notice" in order to supply this critical missing set of proofs. Given that the computer font used in a petition must faithfully replicate what a movable type of the required point size would have produced in order to satisfy "actual compliance," we are hard pressed to understand how this equivalency could be established without evidence from Microsoft, the producer of the Calibri font used here, about not only how it programmed the font but whether it actually replicates what the traditional printer's type block would have produced.

I do not believe that the pastiche of extrarecord evidence relied on by Justice MARY BETH KELLY establishes these necessary proofs. And if they do, we lack sufficient computer expertise to confirm it.[13]

_____

[13] Ordinarily, we judges take judicial notice of things that cannot be disputed, such as the state of the moon on a given date as reflected in an almanac. The cycles and phases of the moon are, after all, constant and predictable. How Microsoft programmed its font system seems well shy of the certainty level required for the application of judicial notice.

If how Microsoft generated its font system and the question of its relationship to the sizing of traditional type blocks is not considered "technical"—outside the realm of common knowledge—then we are not sure what subject matter *would* qualify.

12

Rather, we believe that the proper application of the statutory type size requirement in the context of a digital font requires plaintiff to show that a digital font accurately replicates the results that the point system would have generated. If plaintiff can show that the digitized font system it used accurately replicates a 14-point sized type that the point system would have generated, then it would be entitled to have its petition certified as sufficient. However, only with this showing can we know whether plaintiff's "size 14" Calibri font actually satisfied the statutorily mandated 14-point type size under the traditional movable type point system.

Because plaintiff has not proven the connection between its "size 14" font and the statutorily required 14-point type size, we do not believe that it is entitled to mandamus. Therefore, we concur in the decision to reverse the Court of Appeals panel decision on the merits, but we dissent from the decision to grant mandamus. Nevertheless, because the question whether the font system accurately reproduces what the point system would have produced has never been addressed and because a general substantial compliance rule erroneously had been recognized as a means of avoiding the actual requirements of

Ordinarily, we judges rely on experts, not judicial notice, to resolve technical questions. For instance, MRE 201 allows a trial court to take judicial notice only of adjudicative facts that are "not subject to reasonable dispute" and that are either "generally known within the territorial jurisdiction of the trial court or . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." MRE 201(b). The questions presented here clearly are not of the kind that would qualify under MRE 201. More telling, almost no justification is offered in support of the application of judicial notice that "size 14" Calibri font generates the same result that the applicable point system would have yielded. We do not know whether the Web sources that Justice MARY BETH KELLY relies on are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," MRE 201, and she does not even assert that they meet this exacting standard.

13

this statute, we would permit a remand to the Board of State Canvassers to give plaintiff an opportunity to present proofs under the correct legal standard: that the digital font system actually replicates results that the movable type point system would have generated.  Only upon such proof could plaintiff establish that the heading of its petition is in fact "14-point boldfaced type" as that phrase is properly understood.

Robert P. Young, Jr.
Brian K. Zahra

# STATE OF MICHIGAN

## SUPREME COURT

STAND UP FOR DEMOCRACY,

        Plaintiff-Appellee,

v                                                                    No. 145387

SECRETARY OF STATE and BOARD OF
STATE CANVASSERS,

        Defendants-Appellants,

and

CITIZENS FOR FISCAL
RESPONSIBILITY,

        Intervenor-Defendant-
        Appellant.

_____

CAVANAGH, MARILYN KELLY, and HATHAWAY, JJ. (*concurring in part and dissenting in part*).

We concur in Justice MARY BETH KELLY's holding that a writ of mandamus should issue in this matter. As a result of our concurrence on this point, Proposition 4 will appear on the ballot.

However, we strongly dissent from the grave actions taken by the justices supporting the position in part III(A) of Justice MARY BETH KELLY's opinion. Their decision to depart from 30 years of precedent by abandoning the substantial-compliance doctrine throws Michigan's electoral process into chaos and disenfranchises citizens from one of the most basic rights of democracy: the right to vote.

The holding of these justices that a mere clerical technicality—which has not and cannot be shown to create any harm whatsoever—could have prevented a referendum vote from taking place, in the face of more than 200,000 citizens who signed the petition to place the referendum on the ballot, is unprecedented and highly disturbing.

That position lacks any sense of the gravity and importance of democracy. Article 1, § 1 of Michigan's Constitution states that "[a]ll political power is inherent in the people. Government is instituted for their equal benefit, security and protection." Furthermore, our Constitution provides that "[t]he legislature shall enact laws to preserve the purity of elections" and "to guard against abuses of the elective franchise . . . ." Const 1963, art 2, § 4. MCL 168.482(2) is one of these laws, and it was intended to protect the election process,[1] but four justices have now turned it into a barrier that could prevent a vote from even taking place. Their holding will have a chilling effect on core political speech, and we cannot join this result. As the Court of Appeals so eloquently stated in *Senior Accountants, Analysts & Appraisers Ass'n v Detroit*, 218 Mich App 263, 270; 553 NW2d 679 (1996):

> The wisdom of the principle of judicial restraint expressed by our Supreme Court in [*Attorney General v Ingham Circuit Judge*, 347 Mich 579; 81 NW2d 349 (1957)], is self-evident; the notion that our courts may precipitously intervene in the political arena and preempt a vote of the people is inconsistent with both the role of the courts and the principles of our democracy.

We vote to affirm the Court of Appeals and its issuance of mandamus. As stated, we also concur with Justice MARY BETH KELLY's issuance of mandamus. As a result,

---

[1] See, generally, *Kadans v Wayne Co Clerk*, 363 Mich 306, 308; 109 NW2d 788 (1961).

2

Proposition 4 will appear on the ballot. We note that, given Justice MARY BETH KELLY's finding of actual compliance—which must necessarily encompass substantial compliance, because actual compliance is a *higher* standard than substantial compliance—there are four votes that find at least substantial compliance and allow the voters to determine the merits of this proposal. The determination of whether actual or substantial compliance is the proper standard is unnecessary to the decision in this case.

Michael F. Cavanagh
Marilyn Kelly
Diane M. Hathaway

# STATE OF MICHIGAN

## SUPREME COURT

STAND UP FOR DEMOCRACY,

     Plaintiff-Appellee,

v

No. 145387

SECRETARY OF STATE and BOARD OF
STATE CANVASSERS,

     Defendants,

and

CITIZENS FOR FISCAL
RESPONSIBILITY,

     Intervenor-Defendant-
     Appellant.

---

MARKMAN, J. (*concurring in part and dissenting in part*).

## PROLOGUE

Although to many the present dispute over font size may seem to be "much ado about nothing much" and a debate concerning a mere "technicality," in which there may be only a "dime's width" of difference between what is required of petitions by the law and what is actually contained in the petitions before the Court, a considerably larger issue is implicated: how faithful must the branch of government that *interprets* the law be to the language adopted by the branch of government that *enacts* that law? It is important to bear in mind that the very same constitutional provision that provides for the right of

referendum also provides that it "must be invoked in the manner prescribed by law," Const 1963, art 2, § 9, and it is the very same Constitution that provides for a representative form of government in which legislative majorities, not the views of a small percentage of the electorate, generally determine the course of public policy. Const 1963, art 4, § 1. As explained by Chief Justice Marshall in *Marbury v Madison*, 5 US (1 Cranch) 137, 177; 2 L Ed 60 (1803), which has been the lodestar for generations of judges in questions of statutory construction, the responsibility of a court of law is to declare what the law *is*, and not what it *ought* to be. This is one of the first principles of our system of separated constitutional powers.

In this case, the law in dispute provides that a petition heading "shall" be in 14-point type, the law has been amended by the Legislature to repudiate the idea of "approximateness," and the law explicitly limits the concept of "substantial compliance" to those circumstances in which a petition has been preapproved by the Secretary of State. The question then becomes whether "14-point type" means 14-point type. It is not, I believe, whether 10- or 12-point type is "close enough," or whether 10- or 12-point type is sufficiently legible, or whether it is "Dickensian," "crabbed," "pedantic," "hairsplitting," or "hypertechnical" to distinguish between 10- or 12-point type and 14-point type. Instead, "we the people" of Michigan have determined that an extraordinary constitutional procedure-- one enabling a small segment of the people to enjoin a duly enacted law for up to two years-- "must be invoked in the manner prescribed by law . . . ." Have the proponents of the present referendum acted "in the manner prescribed by law"? Should this Court, for example, in reviewing a law requiring

2

200,000 signatures to place a referendum on the ballot, find that 199,250 signatures is sufficient and constitutes "substantial compliance"? Should this Court, in reviewing a law establishing a five-year statute of limitations period, find that a lawsuit or prosecution undertaken five years and two months after an event is sufficient and constitutes "substantial compliance"? And should this Court, in reviewing a law requiring that a real estate filing be made within 180 days of some occurrence, find that 185 days is sufficient and constitutes "substantial compliance"? Perhaps it should, but it should also be understood that when the law is "relaxed," or altered, in this manner, the law becomes less certain, more subject to judicial discretion and arbitrariness, less capable of clearly communicating to the people their rights and responsibilities, and more the subject matter of new lawsuits. To allow "substantial compliance" to satisfy the law when this has not been authorized by the Legislature is to accord more power to judges, and less power to legislative bodies and the people whom they represent, to say what the law "is."

It is the obligation of the judiciary to interpret the law in reasonable accord with its language, and I believe this has been accomplished when a law requiring that a printed heading be set forth in "14-point type" is interpreted to require "14-point type." It is neither a "strict" construction nor a "narrow" construction to render such an interpretation, but simply a "reasonable" construction-- a construction that ordinary legislators and readers of the law would place upon this language. Had the Legislature been determined to ensure that certain petition headings would always be set forth in 14-point type, and that no gamesmanship would be tolerated in the form of such petitions, how could the Legislature have made this any more clear than by what it said in the law

3

in dispute in this case? How could the Legislature have been any more straightforward in its intention to communicate that "*this* is what we intend, and *only* this, no more and no less"? The issue in this case, as it is in most cases before this Court, is more than the significance of a "dime's width" of difference between "14-point type" and a smaller type on a petition; rather, it is which institution of government gets to make decisions regarding what will be provided for in the law-- the branch comprised of persons broadly reflective of the people in their full range of backgrounds, interests, and professions, or the branch comprised exclusively of lawyers?

ANALYSIS

To begin with, it must be emphasized that the issue before this Court has nothing to do with our own personal beliefs regarding the wisdom, or the lack thereof, of the emergency financial manager law, or of the constitutionality of this law. Plaintiff is incorrect in its assertion that "the only substantial difference between the petition at bar and the [ones in earlier years that have placed matters on the ballot] is the subject matter and viewpoint of the [plaintiff]." Rather, the only two issues before this Court are (a) whether plaintiff actually complied with the 14-point-type requirement in MCL 168.482(2), and (b) if it did not comply, whether "substantial compliance" with this requirement is tantamount to compliance with the law. Because I would answer both of these questions in the negative, I would reverse that part of the judgment of the Court of Appeals holding that "substantial compliance" with MCL 168.482(2) is sufficient to warrant a grant of mandamus, a position with which the judges of that Court disagreed but nonetheless felt obligated to follow because of an earlier precedent of that Court.

4

Pursuant to the clear direction of MCL 168.544d, while "a form prescribed by the secretary of state" must substantially comply with MCL 168.482(2), a form not "prescribed by the secretary of state," as in this case, must actually comply with that law. Therefore, although plaintiff suggests that our interpretation of the 14-point-type requirement in MCL 168.482(2) may prevent a number of petitions from reaching the ballot, each of the other petitions cited by plaintiff was apparently preapproved by the Board of State Canvassers, and thus must only "substantially comply" with the 14-point-type requirement. Further, as highlighted on page 8 of plaintiff's own supplemental brief, even a cursory review of the other petitions will show that each is printed in visibly larger type than that in the instant petition.

(1) Plaintiff seeks a writ of mandamus against defendants. "Mandamus is an extraordinary remedy . . . ." *Musselman v Governor*, 448 Mich 503, 521; 533 NW2d 237 (1995). The plaintiff in a mandamus proceeding has the difficult burden of proving that the defendant has the clear legal duty to act in the way the plaintiff seeks. *Double I Dev Co v Taylor Twp*, 372 Mich 264, 269; 125 NW2d 862 (1964).

(2) Plaintiff urges this Court to direct that defendants certify for placement on the November 2012 general election ballot the referendum on Public Act 4 of 2011, MCL 141.1501 *et seq.*, the Local Government and School District Accountability Act, commonly known as the emergency financial manager law. Generally, it is the right of the people of Michigan to have public policy determined by a majority of the people's democratically elected representatives in the Legislature. However, "[u]nder the referendum clause of the Constitution [Const 1963, art 2, § 9] one-twentieth of the

5

electors of the State may suspend the operation, until the next general election, of any act of the legislature, however important [with certain exceptions] . . . . Where a power so great as this is vested in a minority of the people, every safeguard provided by law against its irregular . . . exercise should be carefully maintained." *Thompson v Secretary of State*, 192 Mich 512, 522-523; 159 NW 65 (1916).

(3) That is, there are constitutional rights in tension in this case, the constitutional right of the people to have the enactments of representatives respected and given timely effect, i.e., the right to a republican form of self-government, see Const 1963, art 4, § 1; US Const, art IV, § 4, and the right of the people under specified circumstances to enjoin the effects of such laws during the referendum process. Const 1963, art 2, § 9. *Thompson* has properly addressed this tension by both recognizing the importance of the referendum process *and* insisting that this process, which involves a departure from the ordinary constitutional process by which laws are formulated, be undertaken in a "regular" fashion and in compliance with the law.

(4) Const 1963, art 2, § 9 provides that "[t]he power of referendum . . . must be invoked in the manner prescribed by law . . . ."

(5) MCL 168.482(2) provides:

> If the measure to be submitted proposes a constitutional amendment, initiation of legislation, or referendum of legislation, the heading of each part of the petition *shall be* prepared in the following form and printed in capital letters in 14-point boldfaced type . . . . [Emphasis added.]

As this Court has stated numerous times, the word "shall" constitutes a mandatory directive. See, e.g., *Manuel v Gill*, 481 Mich 637, 647; 753 NW2d 48 (2008).

6

(6) That the Legislature in 1965 amended MCL 168.482 by striking the language permitting the heading to be in "type of the *approximate* size set forth" and replaced it with the language, "*shall be . . .* in 14-point bold face type," underscores that the Legislature meant "shall be" to constitute a mandatory directive. (Emphasis added.)

(7) MCL 168.544d provides:

> Nominating petitions for the offices under this act and petitions for a constitutional amendment, initiation of legislation, or referendum of legislation or a local proposal may be circulated on a countywide form. Petitions circulated countywide *shall be on a form prescribed by the secretary of state, which form shall be substantially as provided in sections 482, 544a, or 544c*, whichever is applicable. The secretary of state may provide for a petition form larger than 8–1/2 inches by 13 inches and shall provide for identification of the city or township in which the person signing the petition is registered. The certificate of the circulator may be on the reverse side of the petition. *This section does not prohibit the circulation of petitions on another form prescribed by this act.* [Emphasis added.]

Accordingly, while "a form prescribed by the secretary of state" may "substantially comply" with MCL 168.482(2), a form not "prescribed by the secretary of state" must actually comply with MCL 168.482(2). To the extent that *Bloomfield Charter Twp v Oakland Co Clerk*, 253 Mich App 1; 654 NW2d 610 (2002), an opinion of the Court of Appeals, suggests that all petition forms, regardless of whether they were "prescribed by the secretary of state," need only "substantially comply" with MCL 168.482(2), it is wrong, in my judgment, because it is plainly inconsistent with the law. Therefore, I agree with the three other justices who conclude that the "substantial compliance" standard does not apply to forms that have not been "prescribed by the secretary of state."

7

(8) The form at issue in this case was not "prescribed by the secretary of state" because it was not preapproved by the Secretary of State, and it is not in compliance with the Secretary of State's *own* rule that the heading "shall be printed in capital letters in 14-point boldface[d] type . . . ." Secretary of State memorandum, Initiative and Referendum Petitions – Prescribed Format (revised June 2011), p 2. Therefore, the form must actually comply with MCL 168.482(2). As explained in the Secretary of State's memorandum, Initiative and Referendum Petitions (January 2011), p 1, "While Michigan election law does not require the pre-approval of an initiative or referendum petition form, such approval greatly reduces the risk that signatures collected on the form will be ruled invalid due to formatting defects."

(9) Both MCL 168.482(2) and the Secretary of State's own rule require the heading on the form to be "printed in capital letters in 14-point boldfaced type."

(10) The term "point" in the printing context is defined as "a unit of type measurement equal to . . . 1/72 inch . . . ." *Random House Webster's College Dictionary* (2d ed, 1997), p 1006; see also *Webster's New Collegiate Dictionary* (1960), p 652 ("The value of the point is .013837 inch, or nearly 1/72 inch."), and *Spicer v Hartford Fire Ins Co*, 171 Va 428, 432; 199 SE 499 (1938) ("An inch is the American standard of linear measure. . . . A like standard, while it may not be so generally known, is now used in ascertaining the size of type. . . . [T]he point system of measuring type . . . was adopted in 1886 by the United States Type Founders' Association, although prior to that time many founders were using it.").

8

(11) The term "type" is defined consistently among dictionaries as being "a wood or metal block with a raised character on its surface that, when fixed into a press and coated with ink, prints an impression of the character on paper or a similar absorbent surface" or "a printed character or printed characters." *Random House Webster's College Dictionary* (2d ed, 1997), p 1391; see also *Webster's New Collegiate Dictionary* (1960), p 921 ("A rectangular block, usually of metal or wood, having its face so shaped as to produce, in printing, a letter, figure, or other character" or "the letters or characters impressed, collectively."). Therefore, we must determine whether the term "type" in MCL 168.482(2) refers to the blocks used to produce the letters or to the actual printed letters themselves, and, contrary to Justice MARY BETH KELLY's contention, which of these definitions is ultimately controlling is hardly undisputed. Indeed, this matter is at the very heart of the dispute between plaintiff and the Governor, the Attorney General, and the intervening defendant. Also, contrary to the Chief Justice's and Justice MARY BETH KELLY's contention, and as is obvious in the language in this very paragraph, I do not "ignore" these alternative definitions, *ante* at 8 n 8, or "omit[] the definition's reference to blocks," *ante* at 18 n 40. Instead, I see fit to explain exactly *why* I believe the statute is better understood to incorporate the latter definition. See *infra* ¶¶ 12-16. Indeed, it is the Chief Justice who defines "type" as "a printed impression from type," *ante* at 6 n 4, but who "omits" the remainder of that definition that defines type *without* reference to letter blocks, to wit, "a printed impression from type: printed matter <very small type can be hard to read>."

9

(12) "Individual words and phrases, while important, should be read in the context of the entire legislative scheme." *Mich Props, LLC v Meridian Twp*, 491 Mich ___, ___; ___ NW2d ___ (2012), issued June 14, 2012 (Docket Nos. 143085-143087 and 143281), slip op pp 6-7. In the statute at issue here, the term "type" is used in a provision that states that "the heading of each part of the petition shall be . . . *printed in* capital *letters in* 14-point boldfaced *type*." MCL 168.482(2) (emphasis added). That the Legislature specifically used the words "printed" and "letters" indicates that the Legislature was referring to the actual printed letters rather than the blocks used to make these letters. That the Legislature used the word "in" rather than "with" in two relevant places in the statute underscores this interpretation. The Chief Justice gives no consideration at all to this statutory language.

(13) Interpreting "type" to mean the actual printed letters is also consistent with the only reasonable legislative purpose that can be served by MCL 168.482(2), to wit, ensuring that the signers of petitions can easily *read* what it is that they are signing. Interpreting "type," on the other hand, to mean the blocks used in letter-press printing to produce letters would serve no conceivable purpose because the size of a block says nothing about the size of the letter produced by that block. Thus, requiring the preparer to merely use blocks that are physically 14/72 of an inch in size would permit the actual printed letters on the petition to be of the very smallest and most unreadable size.

(14) It is noteworthy that the Chief Justice, who adopts the block argument, cites a treatise on printing that was written in 1918, but by 1954, when MCL 168.482(2) was originally enacted, there were many other methods of printing in addition to the less

10

advanced letter-press method that requires individual blocks. For example, a printing press can use plates and does not require movable letter blocks; and offset printing uses a polyester or metal plate and does not require moveable letter blocks. All of these methods of printing, as well as others, were employed by 1954. Thus, the more reasonable interpretation of "type" is not "a wood or metal block . . . fixed into a press," because this suggests that only printed letters produced by a letter-press are compliant with the statute. This underscores that the "block" definition of "type" unnecessarily focuses on the *method* of production, rather than on the *result* of production, the text or type produced. While the former has no bearing on what will actually be *read* by potential signers of petitions, the latter focuses precisely on what those signers will read.

(15) Indeed, given that blocks are increasingly not used in the modern printing industry, it is difficult to conceive of *how* this Court, or the Secretary of State, or the Board of State Canvassers, or the parties themselves could practically and accurately determine whether the "14-point type" requirement of MCL 168.482(2) has been satisfied in a given instance if "type" means blocks. There are *no* such blocks in this case because the 14-point Calibri font that was used on this petition was not produced by blocks. Indeed, the Calibri font did not even exist when printing blocks were more widely used.

(16) For these reasons, unlike the justices who adopt the printer's-block argument, I do not believe that the 14-point-type requirement of MCL 168.482(2) can be reasonably understood to refer to the size of the *blocks* used to print the letters; instead, I believe it must refer to the actual *printed letters* or *characters*.

11

(17) That MCL 168.482(2) refers to "the heading," and that "type" refers to "printed characters" or "letters or characters impressed, collectively" suggests that the grouping of letters that comprises the heading should be considered as a whole in determining the point size of the type. This is buttressed by the statute's requirement that "capital *letters*" must be printed "*in* 14-point boldfaced *type*." (Emphasis added.) That the statute specifies that the "letters" must be printed in the specified "type" strongly implies that the "type" must be considered as a whole in evaluating whether the point-size requirement has been satisfied. Contrary to Justice MARY BETH KELLY's contention, I do not conclude that the actual printed characters must *each* measure 14/72 of an inch high, nor do I adopt different ways of measuring type under MCL 168.482(2), (3), and (5). Rather, when measuring type under any of these statutory provisions, I conclude only that the language must be collectively measured as described in ¶ 18.

(18) As the Court of Appeals explained, the customary practice in the printing industry is to use a specialized printer's ruler to determine the type size of printed text. *Stand Up For Democracy v Secretary of State*, ___ Mich App ___, ___ n 10; ___ NW2d ___ (2012), issued June 8, 2012 (Docket No. 310047), slip op p 12 n 10. A typical printer's ruler has a scale to measure points, as well as the graduated-sized letter "E" in order to visually represent the range of type size, known as the "E-scale." To determine the point size of the printed text, the ruler is used to measure the distance in points between the ascender height, e.g., the top of the "h," and the descender height, e.g., the bottom of the "p." Thus, although a document may be printed in 14-point type, the actual point size of each letter will vary (e.g., a lowercase "x" will always be significantly less

12

than 14/72 of an inch because it does not contain an ascender or descender). In fact, all individual letters in 14-point type will measure less than 14/72 of an inch because no letter in the English alphabet has both an ascender and a descender. If the printed text does not contain a letter with an ascender and a letter with a descender, the "E-scale" may still be used by comparing an E (or its nearest equivalent) in the text to the ones printed on the ruler. If an "E" in the text measures 14 points on the "E-scale," the type is "in 14-point."

(19) Although it is undisputed that the "font" used in the heading in this case was categorized by the Microsoft software as "14-point," it is also undisputed that the actual size of the printed "type" varies widely depending upon the particular "font" chosen. In other words, a 14-point Calibri font may be of a considerably different type size than a 14-point Arial font. As the Court of Appeals correctly explained, "'font' is *not* a unit of measurement." *Stand Up For Democracy*, ___ Mich App at ___ n 11, slip op p 12 n 11 (emphasis in original). That the Legislature imposed a "14-point type" requirement shows an intent to impose a specific type-size requirement, regardless of the particular font chosen.

(20) Justice MARY BETH KELLY's finding that there is "actual compliance" turns on the fact that Microsoft "defines 'font size' as the 'size of type . . . .'" *Ante* at 23. Although she recognizes that Microsoft does not purport in this definition to define "type," she *assumes* that Microsoft has employed the "printer's block" definition of "type" that she has earlier articulated. However, there is simply no evidence for that conclusion. In fact, the full definition of "font size" provided by Microsoft is:

The size of type, measured in points between the bottom of the descender and the top of the ascender (the vertical point size of a font). Sometimes referred to as the Type or Point Size. [Microsoft Support, WD2002: *Definitions of Typography Terms in Word* <http://support.microsoft.com/kb/192973/en-us> (accessed August 1, 2012).]

This definition supports my ascender/descender measurement set forth in ¶ 18, and not Justice MARY BETH Kelly's "invisible box" argument. Indeed, the diagram on the very same Microsoft typography page cited by Justice MARY BETH KELLY further illustrates that it is the height of the letters-- from highest ascender to lowest descender-- that controls, not the invisible box. For these reasons, I respectfully disagree with Justice MARY BETH KELLY, who concludes that because plaintiff's petition heading is printed in a 14-point *font*, it "actually complies" with the 14-point-*type* requirement in MCL 168.482(2). By this analysis, the Legislature's ability to ever impose a *specific* type-size requirement in order to assure a minimum standard of legibility would be entirely frustrated.

(21) Because the heading on the form here is smaller than 14 points as measured by an E-scale ruler (and considerably so), the form is clearly not in compliance with either MCL 168.482(2) or the Secretary of State's rule. Therefore, plaintiff has failed to satisfy its burden of proving that defendants have any legal duty, much less a *clear* legal duty, for purposes of mandamus relief to certify the instant referendum for placement on the ballot.

(22) Although plaintiff argues that in the past 15 years at least 14 referendums have been placed on the statewide ballot even though their headings were also not 14

14

points in size, plaintiff acknowledges that all of those referendums were preapproved by the Secretary of State. Given this preapproval, those forms would only have had to "substantially comply" with MCL 168.482(2). Plaintiff, on the other hand, did not seek the Secretary of State's preapproval, and thus was required to actually comply with MCL 168.482(2), which it did not do.

(23) Further, it is telling that on page 8 of plaintiff's own supplemental brief, of the six other petition headings set forth in connection with matters that might appear on this year's ballot, each is in larger type than plaintiff's and five of these are in an identical or nearly identical typeface. While plaintiff may, or may not, be correct that its own heading "stands out for readability," it also stands out in the distinctiveness of its type size. Moreover, as the Board of State Canvassers and the Secretary of State indicate, the six other petitions this year were each preapproved by the board, and thus subject only to substantial compliance with MCL 168.482(2).

(24) Concerning the approach of the remanding justices, I see no benefit to be derived from this approach, and the remanding justices fail to explain what the benefit might be. That is, no matter which justice among us has correctly identified the proper method of measuring type, all of the information necessary to assess whether plaintiff's petition satisfies the statute is already before us. See *infra* ¶¶ 25-27. Given existing time constraints, returning this case to the board would serve no purpose other than to effectively make the board, not this Court, the court of last resort on this issue. Before we do that, I would prefer to make the Court of Appeals the court of last resort, because that is what the Constitution and laws of our state certainly contemplate. I would not

remand to the board without first providing it with relevant judicial guidance regarding what the law requires. The board has already deadlocked on the issue of type size and that is why this case is before the Court in the first place.

(25) First, if one adopts the "character size" approach, as I do, a remand is not warranted because MCL 168.482(2) requires the heading to be printed in 14-point type as measured by an E-scale ruler and the intervening defendant has submitted an affidavit that asserts that the heading in this case is not printed in 14-point type as measured by an E-scale ruler, and plaintiff has not argued to the contrary. Further, as the Court of Appeals explained, "[b]ecause 14-point is a unit of measurement *easily determined* by use of an E-scale ruler, neither this Court nor the Board requires expert testimony to determine whether the correct measurement has been met." *Stand Up For Democracy*, ___ Mich App at ___ n 10, slip op p 12 n 10. That is, we can determine ourselves that "the heading on plaintiff's petition only measures 12 point on an E-scale ruler," *id*. at ___, slip op p 12, and no remand to an expert body is required. What possible benefit would be derived from such a remand?

(26) Second, if one adopts the "printer's block" approach, as do the remanding justices, a remand is again unwarranted. The intervening defendant has also submitted an affidavit that provides that plaintiff's heading is clearly smaller than the same heading printed with a variety of 14-point blocks that it has obtained, and again plaintiff has not argued to the contrary. That is, while the intervening defendant has presented evidence that neither the actual printed letters nor the blocks satisfy the 14-point requirement, plaintiff has presented no contrary evidence. Instead, it has been the dominant focus of

16

plaintiff's argument throughout this case that it has "substantially complied" with MCL 168.482(2) and that the difference between the 14-point type required by the statute and the type used in its petition heading, which measures 12 points on an E-scale ruler, amounts to merely a "dime's width of a difference." What possible benefit would be derived from a remand?

(27) Third, if one adopts the "font" approach, as do plaintiff and Justice MARY BETH KELLY, a remand is not warranted given that there is no dispute that plaintiff's petition was in 14-point Calibri font. What possible benefit would be derived from a remand?

(28) Further, for the same reasons that I do not believe that "substantial compliance" constitutes the appropriate legal standard, it is unclear to me how the remanding justices' "faithful replication" standard, in which the board must assess whether the letters produced by Microsoft's 14-point Calibri font are *close enough* to the letters produced by a 14-point Calibri block, if such a block can even be found, is any different than the "substantial compliance" standard that these justices themselves reject.

(29) For all these reasons, I would reverse that part of the judgment of the Court of Appeals holding that "substantial compliance" with MCL 168.482(2) is sufficient to warrant a grant of mandamus.

Stephen J. Markman

17